## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re )<br><br>NITROCRETE, LLC )<br>EIN: 84-4321060 )<br>                                      )<br>             Debtor-in-Possession. )<br>                                      ) | Case No. 21-15739-KHT<br><br>Chapter 11 |

### DECLARATION OF KATHLEEN M. WALTON
### IN SUPPORT OF FIRST DAY RELIEF

I, Kathleen M. Johnston also known as Kathleen M. Walton, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.    I am the Chief Financial Officer of NITROcrete, LLC, a Colorado limited liability company and the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), which has its corporate offices at 2580 E. Harmony Road, Suite 301, Fort Collins, Colorado 80528. I have been the Chief Financial Officer of the Debtor since April 1, 2020.

2.    I submit this declaration (the "First Day Declaration") to provide an overview of the Debtor and this chapter 11 case and to support the Debtor's applications and motions for "first-day" relief. Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtor's business operations and finances, information learned from my review of relevant documents, information supplied to me by Debtor's other management and employees or the Debtor's professional advisors, or my opinions based on my experience, knowledge, and information concerning the Debtor's business operations and finances.

3.    I am authorized to submit this First Day Declaration on Debtor's behalf and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.    On November 18, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado. On the Petition Date, voluntary chapter 11 petitions were also filed in this Court by Nitro Holdings, LLC, the parent of the Debtor, and NITROcrete IP, LLC, NITROcrete Equipment, LLC, and NITROcrete Holdings, LLC, each an affiliate of the Debtor (collectively with the Debtor, the "Nitro Debtors").

5.    The Nitro Debtors are authorized to operate their businesses as debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108. No creditors' committee has yet been appointed in any of the

Nitro Debtors' cases by the Office of the United States Trustee, nor has any trustee or examiner been requested or appointed.

## BACKGROUND OF THE DEBTOR AND BUSINESS OPERATIONS

**I.** **Summary of the Debtor's Business Operations, Assets, and Debt and Equity Structure.**

6. The Nitro Debtors, with approximately 30 employees operating both from headquarters in Fort Collins, Colorado and remotely across the U.S., is an award-winning technology and services provider to the concrete and construction materials industry. The Nitro Debtors are engaged in designing and supplying equipment and innovative technology for an automated liquid nitrogen application process used to control concrete mix temperature. The NITROcrete technology is used by domestic and global concrete companies to manage temperature in the production of concrete for large-scale commercial projects, including urban core skyscrapers, and civil construction projects, such as bridges and dams. The Nitro Debtors have expanded to service more than 30 customers in the U.S. and Canada, with additional expansions in 2020 in Mexico and Brazil through two separate subsidiaries (the "Non-Petition Subsidiaries")

7. The core of the Nitro Debtors' technology is the Nitrogen Application Technology Unit ("NAT Unit"), developed by the company's founders after more than a decade in the concrete batch plan manufacturing industry. The patent-pending NAT Unit incorporates technology and software that maintains liquid nitrogen in a liquid form throughout the concrete cooling process. This technology drives cost and time savings for the Nitro Debtors' concrete producer customers and project owners of large-scale commercial projects, such as skyscrapers, and civil projects, such as bridges and dams.

8. The Nitro Debtors' revenue model is based on subsidizing the initial cost of installation of the NAT Unit technology – ownership of which is maintained by the Nitro Debtors – which, once placed, provides ongoing revenue for delivery or usage of liquid nitrogen by customers without additional meaningful investment.

9. Though 2020 saw a decrease in customer demand for concrete cooling due to unprecedented COVID-19-related work stoppages and project delays, the Nitro Debtors (with Non-Petition Subsidiaries) maintained revenue of $12.1 million, gross profit margin of 53.7% and net loss of $4.8 million. Through September 30, 2021, the Nitro Debtors (with Non-Petition Subsidiaries) had revenue of $11.9 million and net loss of $3.3 million.

10. Zions Bancorporation, N.A. d/b/a Vectra Bank Colorado ("Vectra") is the Nitro Debtors' senior lender. The Nitro Debtors currently have a loan facility with Vectra, comprised of a term loan and a revolving line of credit. In 2020, the Nitro Debtors partnered with Mantucket Capital, who acquired a controlling equity stake in the business for $15 million. Following the disappointing 2020 season, needing additional capital, the Nitro Debtors obtained interim subordinated debt financing from Drew Nelson, the Founder and Executive Chairman of the Nitro

Debtors, and several related parties in early 2021 to allow the Nitro Debtors to continue to pay down some bank debt, cover operating expenses and invest in planned growth expansion.

11. Nitro Holdings, LLC is a holding company with four wholly owned subsidiaries, NITROcrete LLC, NITROcrete IP, LLC, NITROcrete Equipment, LLC, and NITROcrete Holdings, LLC. NITROcrete Holdings, LLC is a holding company with two non-debtor, wholly owned subsidiaries, NITROcrete Brazil and NITROcrete Mexico. Ownership interests in Nitro Holdings, LLC are held by Nitro Management Holdings, LLC, Nitro Founders I, LLC, Nitro Founders II, LLC, Stephen De Bever and MC Nitro, LLC. NITROcrete LLC is the operating entity for the Nitro Debtors. Attached to this declaration as **Exhibit A** is a chart reflecting the corporation organization for the Nitro Debtors.

## II. Prepetition Restructuring Efforts and Circumstances Leading to Filing.

12. The nature of the Nitro Debtors' business is seasonal, with revenue largely occurring in late spring through early fall. Unfortunately, the Debtor has faced short-term financial hurdles that have made it necessary to seek relief in this Court. The COVID-19 pandemic has impacted the Debtor's operations, and that coupled with accruing obligations under onerous legacy vendor contracts and heavy debt burdens, have created an untenable liquidity situation. Further, an unseasonably cool season in certain concentrated geographies this past summer impacted the Debtor's ability to survive through to the spring season.

13. Pre-petition, the Debtor was working on several fronts to reduce its costs, increase its revenue, and expand profitability. In particular, Debtor recently negotiated a surrender of possession agreement at its previous headquarters in Fort Collins, Colorado and has entered into a new and more affordable month-to-month lease for office space and a one-year lease for warehousing certain equipment. Surrendering possession of the previous premises has reduced ongoing costs and will provide additional cash available throughout the bankruptcy process. Debtor has also significantly reduced its workforce. Further, for about the last three months, the Debtor has been in regular discussions with Vectra Bank to try to reach a resolution over its distressed lending relationship with the Debtor. Vectra Bank has offered various proposals to the Debtor's majority investor, but no resolution could be reached. It became evident that absent an infusion of additional capital, the liquidity situation and legacy contract debt would worsen.

14. Beginning in October 2021, without any definitive proposals for an acquisition, merger or financing, the Debtor began to focus more on restructuring alternatives and a potential sale of the Nitro Debtors in bankruptcy. The Debtor hired a financial advisor and an investment banker to evaluate strategic alternatives for the liquidity situation, including, but not limited to, raising debt, obtaining financing, equity, and/or sale of all or certain subsidiaries and subsidiary interests and all Nitro Debtors together. Despite the efforts of the Debtor and its financial advisors and investment bankers, no third-party investors have committed to provide financing or acquisition proposals. After reconnecting with certain of parties previously contacted, the Debtor and its Board of Directors determined there were still no viable financing or acquisition alternatives available to resolve the

Debtor's significant working capital deficit and concerns over its ability to continue going concern operations.

15. Debtor believes that it has a strong opportunity to reorganize or sell as a going concern. The short-term, however, presents a challenge. Debtor believes that Chapter 11 represents the best path for Debtor to survive the off-season, keep its workforce employed, shed certain legacy debts through contract rejection under the Bankruptcy Code, and continue to provide high-quality services to its concrete industry customers.

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

16. To minimize the adverse effects of filing for bankruptcy protection and to facilitate the restructuring of its financial affairs, the Nitro Debtors requested various types of "first-day" relief (collectively, the "First Day Motions") on an interim or final basis. The First Day Motions seek relief intended to allow the Nitro Debtors to operate as necessary and in sufficient capacity to meet and fulfill their duties as debtors-in-possession and other non-bankruptcy legal obligations.

17. I am familiar with the contents of each First Day Motion and the exhibits thereto, and believe the relief sought in each First Day Motion is: (a) necessary to enable the Nitro Debtors to carry out their duties and legal obligations in the chapter 11 cases; (b) critical to achieving a successful reorganization of the Nitro Debtors' business affairs on an expeditious basis; and (c) in the best interest of the Nitro Debtors' bankruptcy estates and creditors. Additionally, and as set forth more fully below, I believe immediate entry of the relief requested in the First Day Motions is necessary and critical to the Nitro Debtors' financial restructurings, preserving the value of their business operations for the benefit of creditors, and achieving a successful reorganization of the Nitro Debtors' business affairs.

### A. Motion for Expedited Entry of First Day Orders

18. On the Petition Date, Debtor NITROcrete, LLC filed a *Motion for Expedited Entry of First Day Orders Pursuant to L.B.R. 2081-1(a) and Notice of Impending Hearing Thereon* ("Expedited Orders Motion"). In the Expedited Orders Motion, NITROcrete, LLC seeks a hearing with the Court under L.B.R. 2081-1 for expedited entry of orders, either on an interim or final basis, granting the relief requested in the First Day Motions.

19. I have reviewed each of these First Day Motions and I am familiar with the relief requested in the First Day Motions. I believe entry of the relief sought in these First Day Motions is necessary to avoid immediate and irreparable harm to the Nitro Debtors, their estates, and creditors. The Nitro Debtors are authorized to operate their businesses as debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108. The Nitro Debtors intend to continue business operations during the chapter 11 cases to maximize value of their respective estates while the Nitro Debtors pursue a sale of the businesses as a going concern as part of their chapter 11 reorganization efforts. Thus, granting the relief requested in the First Day Motions is critical to minimizing the adverse effects on the Nitro Debtors of filing the chapter 11 cases and allowing for uninterrupted operations. Additionally, the

relief requested in each of the First Day Motions is necessary for the Nitro Debtors to continue fulfilling their non-bankruptcy legal obligations, including, but not limited to, regulatory accounting, auditing and financial disclosure filing requirements.

20. Most critically, the relief requested in the First Day Motions will allow the Nitro Debtors to pursue confirmation of a chapter 11 plan of reorganization quickly and efficiently while minimizing administrative costs. Accordingly, I believe immediate entry of the relief requested in the First Day Motions is necessary and critical to the Nitro Debtors' operations, preserving the value of the business operations for the benefit of creditors, and achieving a successful reorganization.

### B. Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral

21. On the Petition Date, the Nitro Debtors filed their Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral ("Cash Collateral Motion").

22. Vectra is the Nitro Debtors' senior lender. Prior to the Petition Date, the Nitro Debtors and Vectra entered into a Credit and Security Agreement, dated as of February 6, 2020, as amended by the First Amendment to Credit and Security Agreement, dated as of January 8, 2021, and as further amended by the Joinder and Second Amendment to Credit and Security Agreement, dated as of July 21, 2021 (collectively, as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). The Credit Agreement, amendments thereto, and all documents, instruments, and agreements executed in connection therewith or related thereto are hereinafter referred to as the "Loan Documents."

23. Pursuant to the Loan Documents, the Nitro Debtors incurred loan obligations (the "Secured Obligations") in favor of Vectra. Those Secured Obligations were in default as of the Petition Date. As of the Petition Date, the Secured Obligations owed to Vectra, without defense, counterclaim or offset of any kind, totaled no less than $7,214,270.86, plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses, and other obligations incurred in connection therewith due under the Loan Documents.

24. As set forth in the Loan Documents, as security for the Secured Obligations the Nitro Debtors granted to Vectra a first-priority valid, perfected and enforceable security interest (the "Prepetition Liens") against all collateral previously pledged by the Nitro Debtors and previously perfected by Vectra as of the Petition Date to secure repayment of the Secured Obligations under the Loan Documents (the "Prepetition Collateral").

25. The Nitro Debtors acknowledge all of their cash, negotiable instruments, deposit accounts, or other cash equivalents in any form, including, without limitation, income, proceeds, products, revenues or profits of property or cash arising from the collection, sale, lease, disposition, use, or conversion to cash of any property, or fees, charges, accounts, or other payments, and such other forms of property as are contemplated under § 363, constitute cash collateral of Vectra governed by § 363, whether Vectra's liens or security interests (including, without limitation, any replacement liens or security interests) existed Petition Date or arise thereafter, and whether such

{Z0368140/7 } 5

property that has been converted to cash existed as of the Petition Date or arose or was generated thereafter (collectively, the "Cash Collateral"). Further, the Nitro Debtors acknowledge all of their cash and cash equivalents, including any cash in deposit accounts, wherever located, and all cash that constitutes proceeds of Prepetition Collateral (as defined in the Loan Documents) are part of the Prepetition Collateral and constitute Cash Collateral subject to the Prepetition Liens of Bank.

26. The Nitro Debtors lack sufficient funds to support their continued operations during the chapter 11 cases unless they are authorized to use Cash Collateral. Prior to the Petition Date, the Nitro Debtors and Vectra engaged in good faith, arm's length negotiations for use of Cash Collateral on an interim basis under the terms and conditions contained in the attached proposed agreed interim order (the "Agreed Interim Cash Collateral Order").

27. The Nitro Debtors intend to continue business operations during the pendency of their chapter 11 cases while seeking a sale of their business operations as a going concern or propose a chapter 11 plan to reorganize their business affairs. To continue the Nitro Debtors' business operations, maximize the value of the Nitro Debtors' businesses as going concerns, and ensure the fullest possible return to creditors, the Nitro Debtors must immediately use the Cash Collateral in which Vectra has an interest. Without the use of the Cash Collateral, the Nitro Debtors will have insufficient funding to permit, among other things, the orderly continuation of the operation of its businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll and to satisfy other working capital needs and other costs associated with Nitro Debtors' business operations.

28. The Nitro Debtors have a critical need for use of Cash Collateral to pay operating expenses associated with its business operations, all in accordance with the Initial Approved Budget (as defined below). The Nitro Debtors lack sufficient available sources of working capital and financing to operate, reorganize or effectuate an orderly wind-down of its remaining business. Indeed, absent approval of the use of Cash Collateral, the Nitro Debtors' operations will be brought to an immediate halt, with damaging consequences for the Nitro Debtors' and their bankruptcy estates and creditors. Use of the Cash Collateral is necessary to the Nitro Debtors' ability to preserve and maintain going-concern value of their businesses for the benefit of creditors and all parties in interest. Failure to grant the relief requested on an interim basis would result in immediate and irreparable harm to the Nitro Debtors' bankruptcy estates. Accordingly, the use of Cash Collateral during the interim period and the payment of the amounts set out in the Initial Approved Budget is necessary to avoid immediate and irreparable harm to the Nitro Debtors' bankruptcy estates. Therefore, the Nitro Debtors, with the agreement and consent of Vectra, propose to use Cash Collateral on an interim basis until such time as the Court schedules a Final Hearing on the use of Cash Collateral. At the Final Hearing, the Nitro Debtors will seek relief to use Cash Collateral during the term of the chapter 11 cases.

29. The Nitro Debtors prepared a cash flow budget setting forth all projected cash receipts and cash disbursements for operations on a weekly basis during the first thirteen (13) weeks (the "Budget Period") of the Nitro Debtors' chapter 11 cases (as such budget may be modified from time to time by the Debtor, the "Initial Approved Budget"), a copy of which is attached as Exhibit A

to Cash Collateral Motion. As set forth in the Initial Approved Budget, the Nitro Debtors intend to use Cash Collateral for, among other things, critical, necessary ongoing operational expenses, insurance, employee payroll and payroll expenses, professional services, rent, supplies, maintenance and repairs, taxes, and utilities, and administrative costs and expenses of the Nitro Debtors incurred in the chapter 11 cases. The Nitro Debtors will adhere to the Initial Approved Budget during the Budget Period, subject to a permitted variance between the aggregate actual disbursements on a consolidated basis and the amounts projected in the Approved Budget of 10% in the aggregate, measured every week on a rolling basis. The Initial Approved Budget was relied upon by Vectra in consenting to the terms and conditions in the Agreed Interim Cash Collateral Order and the Nitro Debtors' use of Cash Collateral.

30. The Nitro Debtors believe the terms of the Cash Collateral arrangement described herein and in the proposed Agreed Interim Cash Collateral Order are fair and reasonable, reflect the Nitro Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms concerning the Nitro Debtors' use of Cash Collateral as provided for in the proposed Agreed Interim Cash Collateral Order were negotiated in good faith and at arms' length between the Nitro Debtors and Vectra. Further, Vectra consents to the use of Cash Collateral under the terms of the proposed Agreed Interim Cash Collateral Order in good faith as that term is used in § 363 of the Code and is entitled to the benefits attendant to such a finding.

### C. Motion to Authorize Payment of Pre-Petition Employee Wages

31. On the Petition Date, the Debtor filed its *Motion for Authority to (a) Pay Prepetition Employee Wages, Salaries and Compensation (b) Pay All Costs and Expenses Related to Such Payments, and (c) Authorizing Financial Institutions to Honor Such Payments* (the "Prepetition Wages Motion").

32. The Debtor's operations, including the operations of the other Nitro Debtors, relies on a workforce of approximately 30 employees, including, but not limited to operations managers, technicians, concrete engineers, sales personnel, accounting and finance personnel, and leadership members (each an "Employee," and, collectively, "Employees"). The Debtor pays its Employees on a bi-monthly basis. For example, during the month of October, Employees were paid on October 8, 2021 and October 22, 2021; during November, Employees were paid on November 5, 2021, and are due to be paid again on November 19, 2021. The Employees will be paid on November 19, 2021 for the payroll period between October 31, 2021 and November 13, 2021 because those payroll obligations were funded by the Debtor pre-petition in the ordinary course of business.

33. In addition, the Debtor routinely withholds from Employee paychecks amounts that the Debtor is required to transmit to third parties. Examples of such withholding include, among others, social security, FICA, federal and state income taxes, employee 401(k) contributions, and health care payments. The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, constitute funds held in trust and, therefore, are not property of the Debtor's

bankruptcy estate. Thus, the Debtor believes that it has authority to direct such funds to the appropriate parties in the ordinary course of business.

34. As of the Petition Date, the Debtor is holding the aggregate amount of $2,530.40 for nine Employees in connection with employee funded 401(k) obligations for the October 31, 2021 through November 13, 2021 payroll period ("Benefit Obligations"). These Benefit Obligations were already withheld from employee paychecks and are drawn from the Debtor's account approximately ten days following the end of the payroll period, with the next draw on November 22, 2021.

35. As of the Petition Date, the Debtor will owe its Employees $46,039.04 in gross wages earned between November 14, 2021 and November 18, 2021 (and together with the Benefit Obligations, the "Prepetition Payroll Obligations"). A redacted list of the Employees, their positions, and approximate amounts owed to each Employee for the Prepetition Payroll Obligations is attached to the Prepetition Wages Motion as <u>Exhibit A</u>.

36. Immediately following the Petition Date, the Debtor will owe these Employees their gross wages earned between November 14, 2021 and November 18, 2021, to be paid on December 3, 2021. Although the Prepetition Payroll Obligations are for wages earned by these Employees during a prepetition period, the Debtor intends, and through this motion seeks authority from the Court, to pay the full Prepetition Payroll Obligations along with wages owed for the November 19, 2021 through November 27, 2021 payroll period in the ordinary course of the Debtor's business operations on or about December 3, 2021, to ensure Employees timely receive the full amount of their wages.

37. The Debtor also requests all applicable financial institutions be authorized to (a) receive, process, and honor all fund transfer requests made by the Debtor related to payment of the Prepetition Payroll Obligations, regardless of whether the fund transfer requests were submitted before, on, or after the Petition Date, and (b) rely on the Debtor's designation of any particular transfer as approved by the order approving the Prepetition Wages Motion.

38. I believe a sound business justification exists for payment of the Prepetition Payroll Obligations. Further, I believe significant Bankruptcy Code-related objectives exist warranting authorization for the Debtor to pay the Prepetition Payroll Obligations. The Employees are vital to the Debtor's business operations and ability to operate as a debtor-in-possession during the pendency of this chapter 11 case. The Debtor's Employees rely on their wages and compensation to pay for housing, food, and energy. Failure to pay the Employees their earned wages and compensation would result in substantial hardship to the Employees. Under the best circumstances, the filing of a chapter 11 petition is a stressful and uncertain event for a debtor's employees. Such stress and uncertainty may adversely affect employee morale at a time when a debtor is particularly vulnerable to business disruptions. Low morale, and a perception that employees are receiving less than favorable treatment, may result in many employees seeking employment elsewhere, including from competitors of the Debtor. Accordingly, honoring the Prepetition Payroll Obligations in the ordinary course of business without interruption will avoid any hardship to the Employees and encourage the Employees to continue their employment with the Debtor.

{Z0368140/7 } 8

39. I believe the Debtor's ability to satisfy the Prepetition Payroll Obligations at the outset of the chapter 11 case is also necessary and essential to the Debtor's continued operations. Payment of the Prepetition Payroll Obligations is necessary for the Debtor to keep the Employees with the company. Loss of the Employees would have immediate negative impacts on the Debtor's ability to continue operations as a debtor-in-possession during chapter 11, and payment of the Prepetition Payroll Obligations would allow the Debtor to operate without interruption, continue to operate its business with minimal disruption, and proceed with the critical task of stabilizing its operations and pursuing a successful chapter 11 reorganization and to preserve value for its estate. Accordingly, such immediate relief as requested in the Prepetition Wages Motion is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the Debtor's business and prospects of reorganization under chapter 11.

Dated this 18th day of November, 2021

                                              Kathleen M. Walton
                                              Chief Financial Officer
                                              Nitro Holdings, LLC; NITROcrete, LLC;
                                              NITROcrete IP, LLC; NITROcrete Equipment, LLC;
                                              NITROcrete Holdings, LLC

39. I believe the Debtor's ability to satisfy the Prepetition Payroll Obligations at the outset of the chapter 11 case is also necessary and essential to the Debtor's continued operations. Payment of the Prepetition Payroll Obligations is necessary for the Debtor to keep the Employees with the company. Loss of the Employees would have immediate negative impacts on the Debtor's ability to continue operations as a debtor-in-possession during chapter 11, and payment of the Prepetition Payroll Obligations would allow the Debtor to operate without interruption, continue to operate its business with minimal disruption, and proceed with the critical task of stabilizing its operations and pursuing a successful chapter 11 reorganization and to preserve value for its estate. Accordingly, such immediate relief as requested in the Prepetition Wages Motion is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the Debtor's business and prospects of reorganization under chapter 11.

Dated this 18th day of November, 2021.

_____
Kathleen M. Walton
Chief Financial Officer
Nitro Holdings, LLC; NITROcrete, LLC;
NITROcrete IP, LLC; NITROcrete Equipment, LLC;
NITROcrete Holdings, LLC

9

**NITRO Holdings Entity Structure**

