# **EXHIBIT 1**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**NITROCRETE, LLC, NITRO HOLDINGS, LLC, NITROCRETE IP, LLC,**

**NITROCRETE EQUIPMENT, LLC, AND NITROCRETE HOLDINGS, LLC,**

**as SELLER,**

**and**

**[ TO BE ADDED ]**

**as BUYER**

**DATED AS OF**

**DECEMBER __, 2021**

# Contents

ARTICLE 1 DEFINITIONS ................................................................................................ 3

ARTICLE 2 PURCHASE AND SALE ............................................................................... 8

    Section 2.1        Purchase and Sale of Assets ................................................ 8
    Section 2.2        Excluded Assets ....................................................................... 9
    Section 2.3        Assumed Liabilities.: ............................................................ 10
    Section 2.4        Excluded Liabilities. ............................................................. 10
    Section 2.5        Exclusion of Assigned Contracts. ...................................... 10
    Section 2.6        Purchase Price. ...................................................................... 11
    Section 2.7        Closing. ................................................................................... 11
    Section 2.8        Transactions to Be Effected at and Following the Closing ........................... 11
    Section 2.9        Allocation of Purchase Price ............................................... 12

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER ....................... 13

    Section 3.1        Organization ......................................................................... 13
    Section 3.2        Due Authorization, Execution and Delivery; Enforceability ...................... 13
    Section 3.3        No Conflicts; Consents ........................................................ 13
    Section 3.4        Assets. .................................................................................... 14
    Section 3.5        Contracts. .............................................................................. 14
    Section 3.6        Legal Proceedings ................................................................ 14
    Section 3.7        Compliance with Laws; Permits. ....................................... 14
    Section 3.8        Environmental Matters. ....................................................... 15
    Section 3.9        Taxes. ..................................................................................... 15
    Section 3.10      Intellectual Property ............................................................ 15
    Section 3.11      Financial Advisors ............................................................... 16
    Section 3.12      No Other Representations and Warranties. ...................... 16

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ....................... 16

    Section 4.1        Organization .......................................................................... 16
    Section 4.2        Due Authorization, Execution and Delivery; Enforceability ...................... 16
    Section 4.3        No Conflicts; Consents ........................................................ 17
    Section 4.4        Financial Advisors ............................................................... 17
    Section 4.5        Solvency ................................................................................ 17
    Section 4.6        Legal Proceedings ................................................................ 17
    Section 4.7        Independent Investigation. ................................................. 17

ARTICLE 5 COVENANTS ............................................................................................... 17

    Section 5.1        Conduct of Business Prior to the Closing ....................... 17
    Section 5.2        Access to Information .......................................................... 18
    Section 5.3        Notice of Certain Events ..................................................... 18
    Section 5.4        Governmental Approvals and Other Third-Party Consents. ...................... 19
    Section 5.5        Books and Records. .............................................................. 19
    Section 5.6        Closing Conditions .............................................................. 20
    Section 5.7        Public Announcements ........................................................ 20
    Section 5.8        Further Assurances. .............................................................. 20
    Section 5.9        Transfer Taxes. ..................................................................... 20
    Section 5.10      Nature of Transaction. ......................................................... 20

Section 5.11   Supplements to Schedules.   ................................................................21
Section 5.12   Bankruptcy Matters................................................................................22


ARTICLE 6 CONDITIONS TO CLOSING................................................................23

Section 6.1   Conditions to Obligations of All Parties.   ..............................................23
Section 6.2   Conditions to Obligations of Buyer.   ....................................................24
Section 6.3   Conditions to Obligations of Seller.   .....................................................25


ARTICLE 7 TERMINATION.........................................................................................26

Section 7.1   Termination by the Parties.......................................................................26
Section 7.2   Effect of Termination...............................................................................27


ARTICLE 8 MISCELLANEOUS ...................................................................................27

Section 8.1   Survival.   ...................................................................................................27
Section 8.2   Expenses; Attorneys' Fees.   ...................................................................27
Section 8.3   Notices.......................................................................................................28
Section 8.4   Interpretation.............................................................................................28
Section 8.5   Headings.....................................................................................................28
Section 8.6   Severability. t.............................................................................................28
Section 8.7   Entire Agreement......................................................................................29
Section 8.8   Successors and Assigns.............................................................................29
Section 8.9   No Third-Party Beneficiaries..................................................................29
Section 8.10   Amendment and Modification; Waiver....................................................29
Section 8.11   Governing Law; Submission to Jurisdiction; Venue. .................................29
Section 8.12   Limitation on Damages.............................................................................29
Section 8.13   Disclosure Schedules.   ...........................................................................29
Section 8.14   Counterparts..............................................................................................30
Section 8.15   Non-Recourse.   .......................................................................................30
Section 8.16   Advice of Counsel.   ...............................................................................30

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of December __, 2021, is entered into by and among NITROcrete, LLC, Nitro Holdings, LLC, NITROcrete IP, LLC, NITROcrete Equipment, LLC, and NITROcrete Holdings, LLC (collectively "Seller"), and [ add name   ] ("Buyer").

## RECITALS

A.        On November 18, 2021 (the "Petition Date"), each Seller filed a voluntary petition for relief commencing a bankruptcy case (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court").

B.        Seller operates, among other things, the Business, as defined below.

C.        Upon the terms and subject to the conditions contained in this Agreement, and as authorized under sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, all of the right, title, and interest of Seller in the Purchased Assets (as defined below), including Seller's interests in the Business, and to assume from Seller the Assumed Liabilities, for operation of the Business.

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE 1:

"Assets" means all property of Seller, whether real, personal, tangible, or intangible, and including all interests, titles, claims, demands, or rights.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 2.10.

"Assigned Contracts" means the Contracts in which Seller has an interest relating to the Business set forth in Schedule 2.1(c), which are to be assigned to Buyer.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"Bid Procedures" means the bid and sale procedures governing the Seller's sale of Assets as set out in the Bid Procedures Order.

"Bid Procedures Order" means the order to be entered in the Chapter 11 Cases governing the Seller's sale of Assets.

"Break-Up Fee Event" means the termination of this Agreement without a Closing (but excluding a termination in the event that Purchaser is in default hereunder) because Buyer receives a Qualified Bid (as defined in the Bid Procedures) from a purchaser other than the Buyer ("Qualified Bidder") and the Qualified Bidder is determined to be the Successful Bidder (as defined in the Bid Procedures) at the Auction and Seller sells substantially all of its assets to such Successful Bidder.

"Books and Records" means Documents, books, and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, suppliers lists, production data, quality control records and procedures, assay reports, environmental studies, reports and analyses, plans, sales records, tax records, strategic plans, material and research, including all technical records, files, papers, surveys and plans or specifications.

"Business" means the designing and supplying equipment and innovative technology for an automated liquid nitrogen application process used to control concrete mix temperature using a Nitrogen Application Technology Unit by Seller.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Denver, Colorado are closed for business.

"Buyer" has the meaning set forth in the Preamble.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claims" means all rights or causes of action (whether in law or equity), legal proceedings, obligations, demands, restrictions, warranties, guaranties, indemnities, consent rights, options, contract rights, rights of recovery, setoff, recoupment, indemnity or contribution, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including all "claims" as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

"Confidentiality Agreement" means that certain Confidentiality Agreement by and between Seller and Buyer.

"Contract" means any agreement, indenture, contract, lease, deed of trust, royalty, license, option, instrument, or other written commitment.

"Cure Amounts" means the amounts which must be paid or otherwise satisfied by Buyer, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Assigned Contracts to Buyer as provided herein as those amounts are

allowed by the Bankruptcy Court, unless such amounts are otherwise agreed upon by Buyer and the counterparty to the applicable Assigned Contract, including the Cure Amounts set forth on Schedule 3.5(a) (as may be supplemented or modified in accordance with this Agreement).

"Cut-Off Date" has the meaning set forth in Section 2.5.

"Debtor" means the Seller in its capacity as debtor in possession in the Chapter 11 Cases.

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement and all references in this Agreement to a particular Schedule are references to Schedules in the Disclosure Schedules and not schedules to this Agreement.

"Documents" means all paper related to the Business in possession of Seller, all electronic data related to the Business stored on Seller's computers, databases, or electronic files, or hosted by third party vendors on behalf of Seller.

"Dollars" and "$" means the lawful currency of the United States.

"Drop Dead Date" has the meaning set forth in Section 7.1(b)(i).

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3), whether or not ERISA applies), and any profit-sharing, bonus, incentive, stock option, stock purchase, stock ownership, pension, retirement, severance, termination, deferred compensation, excess benefit, supplemental unemployment, post-retirement medical or life insurance, welfare, incentive, sick leave, long-term disability, medical, hospitalization, life insurance, other insurance or employee benefit plan, whether formal or informal, oral or written, that, in each case, is sponsored, maintained or contributed to, or required to be contributed to, by Seller or any ERISA Affiliate or under which Seller has or any ERISA Affiliate has, or may have, any present or future liability.

"Encumbrance" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"Environmental Claim" means any action, suit, claim, investigation or other legal proceeding alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence, Release of, or exposure to, any Hazardous Materials, or (ii) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, Governmental Order or binding agreement with any Governmental Authority: (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata), or (ii) concerning the Release or presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.

"Environmental Notice" means any written directive, notice of violation or infraction, or notice or written communication from a Governmental Authority relating to actual or potential material liability arising under or material non-compliance with any Environmental Law or any material term or condition of any Environmental Permit.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Escrow Agreement" means an escrow agreement between Escrow Holder, Buyer and Seller consistent with the terms of this Agreement, in form reasonably satisfactory to such parties, regarding the Escrow Deposit.

"Escrow Deposit" shall have the meaning provided for under Section 2.6(a).

"Escrow Holder" means [ to be added ].

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means each entity that is treated as a single employer with Seller for purposes of Code section 414.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means any Contract that is not an Assigned Contract.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authorities have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority and does not mean or include any Permit.

"Hazardous Materials" means: (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws, and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Intellectual Property" means any and all of the following in any jurisdiction used by Seller in the conduct of the Business: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable and including any content embedded in social media accounts; (iii) trade secrets and confidential know-how; (iv) patents, pending patents and patent applications; (v) websites and internet domain name registrations; (vi) all specifications, drawings, renderings, schematics, design and production details; (vii) all rights in intellectual property related to the Business held by third parties; and (viii) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"Intellectual Property Contracts" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral,

relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which Seller is a party.

"Knowledge" of Seller means the actual knowledge of Stephen DeBever without the requirement to make any inquiries of third parties or Governmental Authorities or to perform any search of any public records.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Real Property" means real property leased by Seller and held for use in connection with the Business.

"Loss" or "Losses" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to the Business, results of operations, financial condition, or assets of the Business taken as a whole, occurring after the execution of the Agreement. "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer.

"Material Permits" has the meaning set forth in Section 3.7(b).

"Membership Interests" means 1% ownership interests of Nitrocrete, LLC and 99 % owner ship interest of NITROcrete Holdings LLC in: (a) NITROcrete (Canada), Ltd, (b) NITROcrete Mexico S DE RL DE CV and (c) NITROcrete Brazil Comercializacao de Sistema de Refrigeracao de Concreto Ltda.

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Permits" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities and held for use in connection with the Business.

"Permitted Encumbrances" means: (i) Encumbrances for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, (ii) mechanics', carriers', workers', repairers' and similar Encumbrances arising or incurred in the ordinary course of business, (iii) environmental or health and safety regulations by any Governmental Authority, (iv) terms and conditions of, and Encumbrances created by, any Assigned Contract that has been disclosed in the Disclosure Schedules, (v) Encumbrances that arise solely by reason of acts of, or with the written approval of, Buyer, (vi) Encumbrances not created by Seller that affect the underlying interest of any Leased Real Property, (vii) any set of facts an accurate up-to-date survey would show, and (viii) any other Encumbrance that would not be materially adverse to the conduct of the Business.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" has the meaning set forth in the recitals.

"Purchase Price" has the meaning set forth in Section 2.6(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order or Orders of the Bankruptcy Court issued pursuant to sections 363, and 365 of the Bankruptcy Code, authorizing and approving, among other things, (a) the sale, transfer and assignment of the Purchased Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Encumbrances (except for Permitted Encumbrances), (b) the assumption and assignment of the Assigned Contracts in connection therewith and (c) that Buyer is a "good faith" purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

"Seller" has the meaning set forth in the Preamble.

"Tangible Property" means all tangible personal property listed on Schedule 2.1(a) and, to the extent not included therein, any tangible personal property included in the Purchased Assets.

"Tax" or "Taxes" means (i) all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, health and safety, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties, unclaimed property and escheat obligations, or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, and (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of the operation of Law or any express or implied obligation to indemnify any other Person.

"Tax Return" means any return, document, declaration, report, election, estimated tax filing, claim for refund, declaration of estimated Tax, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" has the meaning set forth in Section 5.9.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets. Subject to the terms and conditions set forth in this Agreement and in the Sale Order, at the Closing, Seller shall irrevocably sell, assign and transfer to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances other than Permitted Encumbrances, all of Seller's right, title, and interest in, to and under the following Assets and Tangible Property (the "Purchased Assets"):

(a)    the Assets and Tangible Property, including but not limited to the items described in Schedule 2.1(a);

(b)    the Leased Real Property described in Schedule 2.1(b);

(c)      the Assigned Contracts described in Schedule 2.1(c);

(d)      the Permits described in Schedule 2.1(d) under the heading "Transferred Permits";

(e)      the Intellectual Property, including but not limited to the items set forth on Schedule 2.1(e);

(f)      all of Seller's inventory, including but not limited to the Eligible Inventory set forth in Schedule 2.1(f);

(g)      all of Seller's accounts receivable, including but not limited to the Eligible Accounts set forth in Schedule 2.1(g);

(h)      Seller's other general intangibles set forth on Schedule 2.1(h);

(i)      the Membership Interests;

(j)      originals, or where not available, copies, of all Books and Records relating to the Business other than those set forth in Section 2.2;

(k)      all of the rights of Seller under warranties, indemnities, and all similar rights against third parties the extent related to the Business; and

(l)      any and all deposits, prepaids, retainers and similar amounts paid to vendors relating to or in connection with the Business.

Section 2.2      Excluded Assets. Buyer expressly acknowledges and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "Excluded Assets"). For greater certainty, Excluded Assets include the following assets and properties of Seller:

(a)      the Excluded Contracts;

(b)      the organizational documents, minute books, stock books, stock certificates, stock ledgers, corporate seal, Tax Returns, books of account or other records having to do with the corporate ownership, organization of Seller, qualification to do business, or existence of Seller, all employee-related or employee benefit-related files or records, and any other Books and Records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(c)      any Claims of Seller's estate under chapter 5 of the Bankruptcy Code or analogous state statutes including Claims under section 547, 548, 549 or 550 of the Bankruptcy Code;

(d)      all Employee Benefit Plans and all assets and Contracts associated with the Employee Benefit Plans;

(e)      the rights which accrue or will accrue to Seller under this Agreement and the documents and instruments delivered in connection herewith and all cash and non-cash consideration payable and deliverable to Seller under this Agreement or any such documents or instruments;

(f)      any depository, checking or other account maintained by Seller at any bank or financial institution;

(g)     all rights and Claims arising out of, relating to or reasonably necessary to enforce or enjoy the benefits of any Contract that is not an Assigned Contract or any other Excluded Asset, including any security or other deposit, refund, rebate, credit or payment due Seller thereunder;

(h)     all pending litigation or proceedings and all rights, Claims, counterclaims, offsets and causes of action of the Seller's estates asserted or which could be asserted, including, without limitation, any Claims asserted as a defense to any of the proofs of claim filed in the Chapter 11 Cases;

(i)     all equipment and property of any contractor or third party located on any of the Purchased Assets and not owned by Seller; and

(j)     all insurance policies of Seller to the extent related to the Business except for those policies included in Assigned Contracts.

Section 2.3     <u>Assumed Liabilities</u>. Subject to the terms and conditions set forth herein, Buyer shall assume, pay, satisfy, perform and discharge when due only the following liabilities and obligations of Seller with respect to the Purchased Assets and the Business (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all liabilities and obligations relating to the ownership or operation of the Purchased Assets accruing after the Closing Date;

(b)     all liabilities and obligations under any of the Assigned Contracts arising after the Closing Date;

(c)     all Cure Amounts;

(d)     all liabilities and obligations for Taxes: (i) relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof after the Closing Date; and

(e)     all liabilities and obligations listed in <u>Schedule 2.3</u>.

Section 2.4     <u>Excluded Liabilities</u>. Other than the Assumed Liabilities and Permitted Encumbrances, Buyer shall not assume and shall not be responsible to pay, satisfy, perform or discharge any liabilities or obligations of Seller with respect to the Purchased Assets or the Business, whether known, unknown, direct, indirect, absolute, contingent or otherwise, or arising out of facts, circumstances or events in existence on or prior to Closing (collectively, the "<u>Excluded Liabilities</u>").

Section 2.5     <u>Exclusion of Assigned Contracts</u>. From the date hereof until Three Business Days prior to the Sale Hearing (the "<u>Cut-Off Date</u>"), Buyer shall have the right, upon written notice to Seller and the Committee, to exclude any Contract from the Assigned Contracts, or supplement the list of Assigned Contracts to include any Contract that should have been listed on <u>Schedule 2.1(c)</u> (in each case, subject to the requirements of sections 365(a) and 365(f) of the Bankruptcy Code), for any reason. Any Contract so excluded by Buyer shall be deemed to no longer be an Assigned Contract and shall be deemed an Excluded Asset.  Any Schedules hereto shall be amended to reflect any changes made pursuant to this <u>Section 2.5</u> (including schedule 3.5(a) to include Cure Amounts for any additional Assigned Contracts) and Buyer shall have no obligation to pay the Cure Amount (if any) associated with any Contract that is excluded from the Assigned Contracts pursuant to this <u>Section 2.5.</u>

Section 2.6      Purchase Price.

(a)      Escrow Deposit. Within two Business Days after the entry of the Sales Order, Seller and Buyer shall enter into the Escrow Agreement and Buyer shall deposit  [ add figure equal to 10% of purchase price] with the Escrow Holder, as an earnest money deposit (as deposited, together with interest accrued thereon, the "Escrow Deposit").  The Escrow Deposit will be held in trust without interest and shall be disbursed only upon joint direction of Buyer and Seller or upon court order. The Escrow Deposit shall be held by Escrow Holder in a segregated escrow account in accordance with the terms and conditions of the Escrow Agreement and this Agreement.  Seller and Buyer shall bear equally the fees and costs of the Escrow Holder. At Closing, the Escrow Deposit shall be credited and applied toward the Purchase Price. If this Agreement terminates without a Closing, the Escrow Holder shall immediately disburse the Escrow Deposit as follows to Seller if this Agreement is terminated pursuant to Section 6.1, Section 6.3 and/or Section 7.1(c), and to Buyer if this Agreement is terminated pursuant to Section 6.1, Section 6.2, Section 7.1(a), Section 7.1(b) and/or Section 7.1(d).

(b)      Price. The aggregate consideration for the Purchased Assets (the "Purchase Price") shall consist of [ $_____ ] cash (including the Escrow Deposit) plus an amount equal to Cure Costs (the "Cash at Closing") and the assumption of the Assumed Liabilities.

(c)      Wiring Instructions.  No later than three Business Days prior to Closing, Seller shall deliver to Buyer a statement indicating wire transfer instructions for delivery of the Escrow Deposit and the balance of the Cash at Closing.  By 12:00 p.m., Denver, Colorado time on the Closing Date, the Escrow Holder shall deliver the Escrow Deposit and Buyer shall deliver the balance of the Cash at Closing as specified in Section 2.8(b)(i) below.

Section 2.7      Closing.    Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated herein, including the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing"), shall take place electronically via email beginning at 9:00 a.m., Denver, Colorado time, on the first day on which the conditions to Closing set forth in ARTICLE 6 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date) or at such other time or on such other date or at such other place as Seller and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "Closing Date").

Section 2.8      Transactions to Be Effected at and Following the Closing.

(a)      At the Closing, Seller shall deliver to Buyer the following, substantially in the applicable form attached hereto as Exhibit A with respect to the items listed in Section 2.88(a)(ii) through Section 2.88(a)(vi) below:

(i)      a true and correct copy of the Sale Order;

(ii)      a duly executed bill of sale pursuant to which Seller's right, title, and interest in, to, and under all of the Purchased Assets not otherwise assigned at Closing shall be assigned to Buyer or its designee;

(iii)      duly executed assignments covering any Purchased Assets which are owned of record by officers, subsidiaries or other Affiliates of Seller for Seller's benefit rather than by Seller itself, pursuant to which all of their right, title and interest in and to such assets is assigned to Buyer or its designee;

(iv)      duly executed assignments, pursuant to which Seller's right, title, and interest in, to and under all of the Purchased Assets that are Leased Real Property not otherwise assigned at Closing shall be assigned to Buyer or its designee;

(v)     duly executed assignments and bills of sale, pursuant to which Seller's right, title, and interest in, to and under the Purchased Assets that are Tangible Property not otherwise assigned at Closing shall be assigned to Buyer or its designee;

(vi)     duly executed assignments, pursuant to which all of the Purchased Assets that are Assigned Contracts or Permits, in each case, that may be transferred at Closing in accordance with applicable Law, not otherwise assigned at Closing shall be assigned to Buyer or its designee;

(vii)     all login information, usernames, and passwords to the Intellectual Property of the Seller, including social media accounts and website information; and

(viii)     all other agreements, documents, instruments or certificates required to be delivered by Seller at or prior to the Closing pursuant to Section 6.2.

(b)     At the Closing, Buyer shall deliver to, or on behalf of (in the case of Section 2.88(b)(ii)), Seller the following:

(i)     [ list purchase price  ] ; plus the Cure Amounts required to be paid by Buyer in accordance with the terms hereof to the counterparties of the applicable Assigned Contracts;

(ii)     duly executed assumption agreements substantially in the form attached as Exhibit B hereto, pursuant to which the Assumed Liabilities not otherwise assigned at Closing shall be assigned to Buyer;

(iii)     all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to Section 6.3.

Section 2.9     Allocation of Purchase Price. Within thirty days after the Closing Date, Buyer shall deliver to Seller a schedule allocating the Purchase Price among the assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provision of state or local Tax law) or any successor provision (the "Allocation Schedule"). The Allocation Schedule shall be subject to the approval of Seller, which approval shall not be unreasonably withheld or delayed. The Allocation Schedule shall be reasonable and shall be prepared, and subsequently adjusted, in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder. The Allocation Schedule shall be deemed final unless Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within thirty (30) days after delivery of the Allocation Schedule to Seller. In the event of any such objection, Buyer and Seller will work expeditiously and in good faith in an attempt to resolve such dispute within a further period of fifteen (15) days after the date of notification by Seller to Buyer of such dispute, failing which the dispute shall be submitted for determination to an independent national firm of certified public accountants mutually agreed to by Seller and Buyer. The determination of the firm of certified public accountants shall be final and binding upon the parties hereto and shall not be subject to appeal. The firm of certified public accountants shall be deemed to be acting as experts and not as arbitrators. The fees and expenses of such accounting firm shall be borne equally by Seller, on the one hand, and Buyer, on the other. Seller and Buyer shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with the Allocation Schedule (as it may be subsequently adjusted) and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Seller and Buyer shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. Not later than thirty (30) days prior to the filing of their respective Forms 8594 (and analogous state law forms) relating to the Closing, Seller and Buyer shall deliver to the other a copy of its Form 8594 (and such analogous state law forms). Seller and Buyer agree to notify and provide the other party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes or any

other filing with a Governmental Authority regarding the Allocation Schedule. Notwithstanding the preceding sentence, Seller and Buyer may settle any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the allocation of the Purchase Price and other applicable items among the Purchased Assets, and neither Buyer nor Seller shall be required to litigate before any Governmental Authority any proposed deficiency or adjustment by any Governmental Authority challenging any final Allocation Schedule. Notwithstanding anything in this Agreement to the contrary, this <u>Section 2.99</u> shall survive the Closing without limitation. Seller and Buyer acknowledge and agree that this <u>Section 2.9</u> pertains to the allocation of the Purchase Price for Tax purposes, but not for any other purpose.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer as follows:

Section 3.1 <u>Organization</u>. Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Colorado. Seller is duly qualified to do business as a foreign corporation, and is in good standing under the Laws of, each state in which failure to be so qualified would be materially adverse to the conduct of the Business.

Section 3.2 <u>Due Authorization, Execution and Delivery; Enforceability</u>. Subject to the entry of the Sale Order by the Bankruptcy Court, Seller has the corporate power and authority to enter into this Agreement and the other agreements contemplated hereby, and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby. Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite corporate action. This Agreement has been duly executed and delivered by Seller and, subject to the entry of the Sale Order by the Bankruptcy Court, constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 3.3 <u>No Conflicts; Consents</u>. Subject to the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not: (a) result in a violation or breach of any provision of Seller's articles of incorporation or bylaws, (b) result in a violation or breach of any material Governmental Order applicable to Seller, or (c) require the consent of any Person under, conflict with, result in a material violation or breach of, constitute a material default or an event that, with or without notice or lapse of time or both, would constitute a material default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel, any Assigned Contract. No consent, approval, Permit, Governmental Order (other than in connection with the Chapter 11 Cases), declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except (x) entry of the Sale Order by the Bankruptcy Court, and (y) such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not be materially adverse to the conduct of the Business.

Section 3.4    Assets.

(a)    The following Schedules in this Section 3.4(a) are a true and complete list of the respective items indicated below, except where the failure to be a true and complete list would not result in a Material Adverse Effect:

(i)    Schedule 2.1(a) sets forth the Assets and Tangible Property held or used in connection with the Business.

(ii)    Schedule 2.1(b) sets forth the Leased Real Property held or used in connection with the Business.

(iii)    Schedule 2.1(c) sets forth the Assigned Contracts held or used in connection with the Business.

(iv)    Schedule 2.1(d) sets forth the Permits held or used in connection with the Business.

(v)    Schedule 2.1(e) sets forth the Intellectual Property held or used in connection with the Business.

(vi)    Schedule 2.1(f) sets forth the inventory held or used in connection with the Business as of the date of the execution of this Agreement.

(vii)    Schedule 2.1(g) sets forth the accounts receivable in connection with the Business as of the date of the execution of this Agreement.

(b)    Seller owns an undivided interest in and to the Purchased Assets.

(c)    Seller has a valid and enforceable leasehold interest in the Leased Real Property set forth in Schedule 2.1(b).

(d)    The Purchased Assets constitute all of the material Assets and Tangible Property used in the Business (i) as it is currently conducted other than the Excluded Assets and (ii) that are necessary to conduct the Business in all material respects as it is currently conducted.

(e)    Seller has, and subject to the Sale Order shall convey to Buyer at the Closing, good and marketable title to all of the Purchased Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances).

Section 3.5    Contracts.

(a)    Schedule 3.5(a) sets forth Seller's estimate, based on reasonable inquiry, as of the date hereof, of the Cure Amounts associated with each Assigned Contract.

Section 3.6    Legal Proceedings.  Except as set out in Schedule 3.6, there are no actions, suits, claims or other legal proceedings pending, in each case before a Governmental Authority, or to Seller's Knowledge threatened, against Seller relating to the Business, which would be materially adverse to the conduct of the Business.

Section 3.7    Compliance with Laws; Permits.

(a)    Buyer has not been given notice or been charged with any material violation of any Law of any Governmental Authority.  To Seller's Knowledge, Seller is not in material violation of any Law.  No material investigation or review by any Governmental Authority is pending or, to Seller's Knowledge, threatened, against Seller or any of its assets and

properties, nor has any Governmental Authority indicated to Seller an intention to conduct the same. Seller has complied in all material respects with all applicable Laws in the operation of the Business and ownership and use of the Purchased Assets.

(b)  None of the representations and warranties contained in this Section 3.7 shall relate to or be deemed to relate to environmental matters or health and safety (which are governed exclusively by Section 3.8, tax matters (which are governed exclusively by Section 3.9) or intellectual property matters (which are governed exclusively by Section 3.10).

Section 3.8  Environmental Matters.

(a)  To Seller's Knowledge, (i) Seller is in material compliance with all Environmental Laws, except where the failure to be in such compliance would not be expected to be materially adverse to the conduct of the Business, and Seller has not received any Environmental Notice or Environmental Claim relating to the Business or the Purchased Assets, which either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)  Schedule 3.8(b) sets forth each of the material Environmental Permits necessary for the operation of the Business, each of which is in full force and effect. Seller has obtained and is in material compliance with all Environmental Permits listed in Schedule 3.8(b).

(c)  To Seller's Knowledge, there has been no Release of Hazardous Materials in contravention of Environmental Laws or that would be materially adverse to the conduct of the Business.

(d)  Seller has not entered into, and to Seller's Knowledge, the Purchased Assets are not otherwise subject to (i) any consent decree, order, judgment or judicial order relating to compliance with Environmental Laws or Environmental Permits or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Materials, and no litigation is pending with respect thereto, or (ii) any environmental indemnification in connection with any threatened or asserted claim by any third party for any liability under any Environmental Law or relating to any Hazardous Materials.

Section 3.9  Taxes.

(a)  Except as set forth in Schedule 3.9(a), (i) all Taxes due and owing by Seller with respect to the Purchased Assets have been duly and timely paid in full, (ii) no Tax deficiencies are being proposed in writing or have been assessed by any Governmental Authority with respect to the Purchased Assets that remain outstanding or unsatisfied, (iii) there are no Tax liens on any of the Purchased Assets for which Seller would be responsible, other than liens for Taxes not yet due and payable, (iv) no federal, state, local or foreign audits or administrative or judicial proceedings are presently pending, or threatened in writing, with regard to any Taxes or Tax Returns with respect to the Purchased Assets.

(b)  The representations and warranties set forth in this Section 3.9 are the exclusive representations and warranties made by Seller with respect to Taxes.

Section 3.10  Intellectual Property.

(a)  Schedule 2.1(e) sets forth an accurate and complete list of: (i) all trademarks, tradenames, and patents (A) owned by Seller and  (B) registered or pending applications for registration of any trademarks, tradenames, or patents described in clause (A) in any jurisdiction; (ii) all domain names of Seller, (iii) websites and internet domain name registrations; and (iv) all other intellectual property and industrial property rights and assets, and

all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing. Except as set forth in Schedule 2.1(e), Seller does not own, license or use any registered copyrights in connection with the Business except for off-the-shelf software used in the ordinary course of business.

(b) Except as would not be materially adverse to the conduct of the Business, (i) Seller owns or has the right to use all Intellectual Property used in the ordinary course of the Business and (ii) all required filings and fees owed by Seller related to Seller's Intellectual Property have been timely filed with and paid to the relevant Governmental Authorities.

(c) To Seller's Knowledge: (i) the conduct of the Business, as currently conducted, does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any other Person; and (ii) no other Person is infringing, misappropriating or otherwise violating any Intellectual Property of Seller.

(d) The Intellectual Property set forth on Schedule 2.1(e) is all of the Intellectual Property necessary to operate the Business as presently conducted.

(e) There are no actions, suits, claims or other legal proceedings pending, in each case before a Governmental Authority, or to Seller's Knowledge threatened: (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business or (ii) challenging the validity, enforceability, registrability or ownership of any of Seller's Intellectual Property.

(f) The representations and warranties set forth in this Section 3.10 are the exclusive representations and warranties made by Seller with respect to Intellectual Property.

Section 3.11    Financial Advisors.  Other than SSG Advisors, LLC, no agent, broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

Section 3.12    No Other Representations and Warranties. Except for the representations and warranties contained in this ARTICLE 3 (including the related portions of the Disclosure Schedules), Seller has not and no Affiliate or Representative of Seller, or any other Person, has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information furnished or made available to Buyer and its Representatives (including any projections, information, documents or material made available to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business or any representation or warranty arising from statute or otherwise in law.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

Section 4.1    Organization. Buyer is a  [        ]  under the laws of the  [      ]  duly organized, validly existing and in good standing under the Laws of such jurisdiction.

Section 4.2    Due Authorization, Execution and Delivery; Enforceability. Buyer has the requisite company power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite company

action. This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.3    No Conflicts; Consents.  The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not: (a) result in a violation or breach of any provision of the organizational documents of Buyer, (b) result in a violation or breach of any material Governmental Order applicable to Buyer, or (c) require the consent of any Person under, conflict with, result in a material violation or breach of, constitute a material default or an event that, with or without notice or lapse of time or both, would constitute a material default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel, any material contract of Buyer.  No consent, approval, Permit, Governmental Order (other than in connection with the Chapter 11 Cases), declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

Section 4.4    Financial Advisors.  No agent, broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

Section 4.5    Solvency.  Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall:  (a) be able to pay its debts as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities), and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller.  In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 4.6    Legal Proceedings.  There are no actions, suits, claims or other legal proceedings pending against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

Section 4.7    Independent Investigation.  **BUYER HAS CONDUCTED ITS OWN INDEPENDENT INVESTIGATION, REVIEW AND ANALYSIS OF THE BUSINESS AND THE PURCHASED ASSETS. BUYER ACKNOWLEDGES AND AGREES THAT:  (A) IN MAKING ITS DECISION TO ENTER INTO THIS AGREEMENT AND TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED HEREBY, BUYER HAS RELIED UPON ITS OWN INVESTIGATION AND ONLY THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLER SET FORTH IN ARTICLE 3 (INCLUDING THE RELATED PORTIONS OF THE DISCLOSURE SCHEDULES), AND (B) NONE OF SELLER, ANY AFFILIATE OR REPRESENTATIVE OF SELLER OR ANY OTHER PERSON HAS MADE OR MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER WRITTEN OR ORAL, ON BEHALF OF SELLER.**

## ARTICLE 5
## COVENANTS

Section 5.1    Conduct of Business Prior to the Closing.  From the date hereof until the Closing:

(a)     Seller shall use its commercially reasonable efforts to:

(i)     maintain and preserve intact the current organization, business and franchise of the Business and to preserve the rights, goodwill and relationships of the customers, suppliers and others having business relationships with the Business; and

(ii)     pay all Taxes when due with respect to the Purchased Assets required to be paid by Seller and not allow the Purchased Assets to become subject to a lien for Taxes required to be paid by Seller, other than for Taxes not yet due and payable.

(b)     Except (i) as expressly required or permitted by this Agreement, (ii) as required pursuant to applicable Laws or any Governmental Authority, (iii) as consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), or (iv) as required to respond reasonably and prudently to an emergency or disaster (including the right to take forthwith any action required to insure the safety and integrity of the Business), Seller shall not:

(i)     acquire any business;

(ii)     sell, transfer, dispose of, lease, encumber, relinquish or abandon any of the Purchased Assets, except sales and other dispositions in the ordinary course of business;

(iii)     outside the ordinary course of business, enter into any Contract that would reasonably be likely to become an Assigned Contract; and

(iv)     settle, offer or propose to settle, compromise, assign or release any material proceeding brought against Seller in respect of or in connection with the Business or the Purchased Assets;

Section 5.2     Access to Information.  From the date hereof until the Closing, Seller shall:  (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business or the Purchased Assets, (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business or the Purchased Assets as Buyer or any of its Representatives may reasonably request, and (c) instruct the Representatives of Seller to use commercially reasonable efforts to cooperate with Buyer in its access to and inspection of the Purchased Assets and the Business; provided, however, that any such access or inspection shall be conducted at Buyer's sole risk and at Buyer's sole cost and expense during normal business hours upon at least two (2) Business Days' prior written notice to Seller, under the supervision of Seller's personnel, in compliance with all of Seller's health, safety and environmental regulations and procedures, and in such a manner as not to interfere with the normal operations of the Business. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would, in Seller's discretion:  (x) cause significant competitive harm to Seller and/or the Business if the transactions contemplated by this Agreement are not consummated, (y) jeopardize any attorney-client or other privilege, or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of Seller, Buyer shall not contact any suppliers to, or customers of, the Business, and Buyer shall have no right to perform invasive or subsurface investigations of any properties.  Buyer shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided under this Agreement.

Section 5.3     Notice of Certain Events.  Seller and Buyer agree that, subject to applicable Law, each shall provide the other, and the Committee, prompt notice in writing of:

(a)      any notice or communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)      any material notice or communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

(c)      any material proceeding commenced or threatened against it which relates to the consummation of the transactions contemplated by this Agreement, other than the Chapter 11 Cases; and

(d)      any failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied under this Agreement; provided that the giving of any such notice shall not in any way (i) change or modify the representations and warranties of the parties hereto or the conditions in their favor contained in this Agreement or otherwise affect the remedies available to Seller or Buyer under this Agreement, (ii) have any effect on the satisfaction of any of the conditions to closing set forth in ARTICLE 6, or (iii) be deemed to amend or supplement the Disclosure Schedules.

Section 5.4      Governmental Approvals and Other Third-Party Consents.

(a)      Each party hereto shall, as promptly as possible, use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement, except for consents, authorizations, orders and approvals with respect to Permits that cannot be obtained until after the Closing. Each party shall reasonably cooperate with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)      With respect to the Permits, Buyer will meet with the relevant state and federal agencies with respect to the modification, transfer, replacement or reissuance, as applicable, of such Permits, which shall occur following Closing. Each party shall use commercially reasonable efforts to cause the modification, transfer, replacement or reissuance, as applicable, of the Permits promptly following Closing, provided that Seller shall not be obligated to pay any consideration in connection therewith and/or to incur any third-party expenses or reimbursement obligations to Buyer in doing so.

Section 5.5      Books and Records.

(a)      In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of seven (7) years after the Closing, Buyer shall:  (i) retain the Books and Records (including personnel files) of the Business relating to the period prior to Closing, and (ii) upon reasonable notice, afford the Representatives of Seller (and any trustee or liquidating trustee appointed in the Chapter 11 Cases) reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to Buyer's personnel and employees, to Buyer's computer service and other equipment, and to those portions, and only those portions, of such Books and Records as relate to the period prior to Closing and, if required by Buyer, subject to Seller executing a non-disclosure agreement with respect to such information, in form and substance acceptable to the parties hereto, acting reasonably.

(b)      Buyer shall not be obligated to provide Seller with access to any books or records (including personnel files) pursuant to this Section 5.5 where such access would violate

any Law.  Notwithstanding anything in this Agreement to the contrary, this Section 5.5 shall survive the Closing without limitation.

Section 5.6    Closing Conditions.  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE 6 for which it is responsible.

Section 5.7    Public Announcements.  Seller and Buyer shall consult with each other prior to issuing any press releases or otherwise making public statements with respect to this Agreement or the transactions contemplated by this Agreement and, to the extent practicable, shall provide the other party with an opportunity to review and comment on all such press releases or statements prior to the release thereof.  To the extent that any such press release or public statement is required by applicable Law, by a rule of a stock exchange on which a party's shares (or those of any of its Affiliates) are listed or traded or by a Governmental Authority, the press release or public announcement shall, to the extent practicable, be issued or made after consultation with the other party hereto and taking into account such other party's comments, provided that such consultation does not, and reasonably would be expected not to, cause non-compliance with any such Law or rule.  If such advance consultation is not reasonably practicable or legally permitted, to the extent permitted by applicable Law, the disclosing party shall provide the other party with a copy of any written disclosure made by such disclosing party as soon as practicable thereafter.

Section 5.8    Further Assurances. Following the Closing, each of the parties hereto shall, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to vest title to the Purchased Assets in Buyer, carry out the provisions hereof and give effect to the transactions contemplated by this Agreement, in each case, at the sole cost and expense of the requesting party.  Without limiting the generality of the foregoing, during the thirty (30) day period following the Closing, Buyer shall afford the Representatives of Seller reasonable access, during normal business hours, to Buyer's property for the purpose of recovering and/or removing any of the Excluded Assets remaining on such property.  Notwithstanding anything in this Agreement to the contrary, this Section 5.8 shall survive the Closing without limitation.

Section 5.9    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any real property transfer Tax and any other similar Tax) (all such Taxes collectively, "Transfer Taxes") shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return with respect to Transfer Taxes (and Seller shall cooperate with respect thereto as necessary).  Each of Buyer and Seller agrees to timely sign and deliver (or to cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes.

Section 5.10    Nature of Transaction.

(a)    **SELLER IS SELLING, AND BUYER IS ACQUIRING, THE PURCHASED ASSETS "AS IS", "WHERE IS" AND "WITH ALL FAULTS, LIMITATIONS AND DEFECTS (HIDDEN AND APPARENT)" AND SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 3, WITHOUT ANY OTHER REPRESENTATION OR WARRANTY OF ANY NATURE WHATSOEVER AND WITHOUT ANY GUARANTEE OR WARRANTY (WHETHER EXPRESS OR IMPLIED), INCLUDING AS TO TITLE, QUALITY, MERCHANTABILITY OR FITNESS FOR BUYER'S INTENDED USE OR A PARTICULAR PURPOSE OR ANY USE OR PURPOSE WHATSOEVER.**

(b)    **FURTHER, EXCEPT AS SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY DIRECTOR, OFFICER, MANAGER, EMPLOYEE,**

AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLER, NOR ANY OTHER PERSON HAS MADE ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EXPRESS, IMPLIED OR STATUTORY, WRITTEN OR ORAL, RESPECTING THE PURCHASED ASSETS, ANY PART OF THE PURCHASED ASSETS, THE FINANCIAL PERFORMANCE OF THE PURCHASED ASSETS, OR THE PHYSICAL CONDITION OF THE PURCHASED ASSETS.

(c)     BUYER ACKNOWLEDGES AND AGREES THAT IT IS AN INFORMED AND SOPHISTICATED PURCHASER, AND HAS ENGAGED EXPERT ADVISORS, EXPERIENCED IN THE EVALUATION AND PURCHASE OF PROPERTY AND ASSETS SUCH AS THE PURCHASED ASSETS AS CONTEMPLATED HEREUNDER.     BUYER ACKNOWLEDGES AND AGREES THAT IT HAS UNDERTAKEN SUCH INVESTIGATION AND HAS BEEN PROVIDED WITH AND HAS EVALUATED SUCH DOCUMENTS AND INFORMATION AS IT HAS DEEMED NECESSARY TO ENABLE IT TO MAKE AN INFORMED AND INTELLIGENT DECISION WITH RESPECT TO THE EXECUTION, DELIVERY AND PERFORMANCE OF THIS AGREEMENT.

(d)     BUYER AND SELLER FURTHER ACKNOWLEDGE THAT THE CONSIDERATION FOR THE PURCHASED ASSETS SPECIFIED IN THIS AGREEMENT HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER GOOD-FAITH ARMS'-LENGTH NEGOTIATION.

(e)     BUYER HAS RELIED, AND SHALL RELY, SOLELY UPON ITS OWN INVESTIGATION OF ALL SUCH MATTERS AND THE REPRESENTATIONS, WARRANTIES AND COVENANTS CONTAINED IN ARTICLE 3.

(f)     Following the Closing, each of the parties hereto hereby agrees and acknowledges that (a) the parties hereto hereby disclaim all Losses and responsibility for any representation or warranty (including any representation or warranty set forth in ARTICLE 3 or ARTICLE 4 or any express or implied warranty, any warranty as to accuracy or completeness or any warranty as to fitness for a particular purposes), omission, agreement, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the other party hereto or its Affiliates or Representatives or any other Person (including any opinion, information, projection, or advice that may have been or may be provided, directly or indirectly (including on or by access to any online data room), to the other party hereto or its Affiliates or Representatives by any director, officer, manager, employee, agent, consultant, or Representative of such party); (b) Seller makes no representations or warranties to Buyer regarding the probable success, profitability or value of any of the Purchased Assets; and (c) no party hereto shall have any liability with respect to, and no party hereto shall be permitted nor shall it assert any indemnification claim, liability or Loss with respect to, the foregoing matters, whether pursuant to this Agreement, common law, or otherwise.

Section 5.11     Supplements to Schedules.  Prior to the Cut-Off Date, Seller shall have the right from time to time to supplement, modify or update the Disclosure Schedules upon written notice to Buyer and the Committee.  Upon receipt of any such supplement, modification or update that in the reasonable judgment of Buyer would cause the condition set forth in Section 6.2(a) to not be satisfied at the Closing, Buyer shall have ten (10) Business Days from the date of receipt to object to such supplement, modification or update and, in the event of such an objection, the Disclosure Schedules shall not be deemed to have been supplemented, modified or updated with respect to such objected to item; provided, however, that if Buyer fails to so object within the ten (10) Business Day period or accepts any portion of the supplement, modification or update, such supplement, modification or update (or portion with respect to which Buyer does not object) shall be deemed to supplement, modify or update the Disclosure Schedules and Seller shall not be deemed to have breached or violated any of its respective representations, warranties, covenants or agreements in this Agreement with respect thereto.

Section 5.12     Bankruptcy Matters.

(a)     Bid Procedures/Proceed in Good Faith.  The proposed sale and Buyer's agreement to acquire the Purchased Assets as set out herein shall be subject to higher and better bids and other processes and procedures in accordance with the Bid Procedures.  Seller shall proceed promptly and in good faith using commercially reasonable efforts to obtain a Sale Order meeting the requirements specified in Section 5.12(d) below and in such further form and substance satisfactory to Buyer in its sole discretion.

(b)     Compliance.

(i)     Seller shall comply with all of its obligations under the Sale Order (after the entry of such Sale Order by the Bankruptcy Court).

(ii)     Seller shall use commercially reasonable efforts to comply with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement.

(iii)     Seller shall move to assume and assign to Buyer the Assigned Contracts that are executory contracts capable of being assumed and assigned pursuant to section 365 of the Bankruptcy Code and shall provide notice thereof to (A) all counterparties to such contracts, (B) any third party beneficiary to such contracts as reasonably requested by Buyer (which third party beneficiaries shall be identified by Seller using its commercially reasonable best efforts), (C) any other Person that Buyer reasonably requests, and (D) any other Person as may be required by applicable Bankruptcy Rules and any applicable local rules of the Bankruptcy Court.  Seller has the right to reject any Contract that is not an Assigned Contract in accordance with the Bankruptcy Code.

(c)     Environmental Matters.  Nothing in the Sale Order or this Agreement releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to any Governmental Authority that any Person would be subject to as the owner or operator of the Purchased Assets after the Closing Date. Nothing in the Sale Order shall authorize the transfer or assignment to Buyer of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy Law governing such transfers or assignments. Notwithstanding the foregoing sentence, nothing in the Sale Order shall: (A) be interpreted to deem Buyer as the successor to the Debtor under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the Closing Date or for liabilities relating to off-site disposal of waste by the Debtor prior to the Closing Date; (B) create for any Governmental Authority any substantive right that does not already exist under Law; or (C) be deemed or construed to be an admission of liability by the Debtor.

(d)     Sale Order.  This Agreement and the transactions contemplated hereby are contingent upon and subject to approval of the Bankruptcy Court through the entry of a Sale Order.  The Sale Order will provide, among other things, that pursuant to sections 363 and 365 of the Bankruptcy Code:

(i)     the Purchased Assets shall be sold to Buyer free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities);

(ii)     to the extent that (A) there are restrictions on the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset or (B) the same would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), then (1) such consent, authorization, approval or waiver is not

required and/or (2) the Purchased Asset subject to such consent, authorization, approval or waiver shall be assigned or transferred regardless of any such restriction or necessary consent, authorization, approval or waiver and that there shall be no breach or adverse effect on the rights of Seller or Buyer for the failure to obtain any such consent, authorization, approval or waiver or otherwise comply with such restriction;

(iii)     the transactions contemplated by this Agreement were negotiated at arm's length, that Buyer acted in good faith in all respects and Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(iv)     the terms and conditions of the sale of the Purchased Assets to Buyer as set forth herein are approved;

(v)     Seller is authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(vi)     Buyer and Seller did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(m) of the Bankruptcy Code; and

(vii)     the Sale Order is binding upon any successors to Seller, including any trustees in respect of Seller or the Purchased Assets in the case of any proceeding under chapter 7 of the Bankruptcy Code.

(e)     If the Sale Order is appealed, Buyer and Seller shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

(f)     Seller further covenants and agrees that the terms of any plan of reorganization or liquidation, or any order of dismissal, submitted to the Bankruptcy Court by Seller shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

(g)     [* *ONLY IF A BUYER IS SELECTED TO BE A STALKING HORSE BIDDER UNDER THE BID PROCEDURES, OTHERWISE THIS SECTION SHOULD BE DELETED ** Break-up Fee/Expense Reimbursement.   Seller agrees and acknowledges that Buyer's negotiation and execution of this Agreement has required a substantial investment of Seller agrees and acknowledges that Purchaser's negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of financial and other resources by Buyer, and that the negotiation and execution of this Agreement have provided value to Seller.  Therefore, Seller shall pay or cause Buyer to be paid cash in an amount equal to [2.5% of the Purchase Price] as a break-up fee (the "Break-Up Fee") and reimburse Buyer for all out of pocket expenses incurred by Buyer in connection with this Agreement and the proposed transactions set out herein in an amount not to exceed $50,000 (the "Expense Reimbursement") upon an Break-Up Fee Event.  Any Break-Up Fee and Expense Reimbursement that may become due shall be payable solely out of the proceeds of an alternative transaction upon a Break-Up Fee Event.  ]

**ARTICLE 6**
**CONDITIONS TO CLOSING**

Section 6.1     Conditions to Obligations of All Parties.  The obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following condition: no Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or

causing the transactions contemplated by this Agreement to be rescinded following completion thereof and there shall not have been enacted or made applicable any Law that makes the transactions contemplated by this Agreement illegal or otherwise prohibited.

The foregoing condition is for the exclusive benefit of Seller and Buyer and any such condition may be waived in whole or in part by Seller and Buyer at or prior to the time of Closing by each delivering to the other a written waiver to that effect.  Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity Seller or Buyer may have, including any claims Seller or Buyer may have for breach of covenant, representation or warranty by the other party, and also without prejudice to Seller's and Buyer's rights of termination in the event of non-performance of any other conditions in whole or in part.

      Section 6.2    <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

      (a)    The representations and warranties of Seller contained in <u>ARTICLE 3</u> shall be true and correct in all material respects.

      (b)    There shall be no Material Adverse Effect as of the Closing Date.

      (c)    There shall be in effect any and all Permits  which are necessary for Buyer to conduct business immediately following the Closing.

      (d)    Seller shall have duly performed and complied in all material respects with all material agreements, covenants and conditions required by this Agreement to be performed or complied with by Seller prior to or on the Closing Date and Seller shall have delivered to Buyer a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to Seller's agreements, covenants and conditions.

      (e)    Seller shall have delivered to Buyer duly executed counterparts of each other document, certificate and instrument set forth in <u>Section 2.8(a)</u> to be executed and delivered by Seller.

      (f)    The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance reasonably acceptable to Buyer, and, as of the Closing Date the Sale Order shall be in full force and effect and shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified in any material respect without the prior written consent of Buyer.

      (g)    The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari.  Notwithstanding anything herein to the contrary, the parties may, in their sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that Buyer is a "Good Faith Purchaser" pursuant to section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section of the Bankruptcy Code.

      (h)    The Assigned Contracts shall have been assumed by Seller, as applicable, and assigned to Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code.

The foregoing conditions are for the exclusive benefit of Buyer and any such condition may be waived in whole or in part by Buyer at or prior to the time of Closing by delivering to Seller a written waiver to that effect executed by Buyer.  Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity Buyer may have, including any claims Buyer may have for breach of

covenant, representation or warranty by Seller, and also without prejudice to Buyer's rights of termination in the event of non-performance of any other conditions in whole or in part.

Section 6.3    Conditions to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Buyer contained in ARTICLE 4 shall be true and correct in all material respects as of the Closing Date as if made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, then as of such date) and Buyer shall have delivered to Seller a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to Buyer's representations and warranties.

(b)    Buyer shall have duly performed and complied in all material respects with all material agreements, covenants and conditions required by this Agreement to be performed or complied with by Buyer prior to or on the Closing Date and Buyer shall have delivered to Seller a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to its agreements, covenants and conditions.

(c)    Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of the constituent documents of Buyer, all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby.

(d)    Seller shall have received a certificate of good standing for Buyer from the Secretary of State of Buyer's jurisdiction of incorporation or organization, as applicable.

(e)    Buyer shall have delivered the Cash at Closing as specified in Section 2.6 and shall have delivered evidence to Seller that the Cure Amounts have been or will be paid.

(f)    Buyer shall have delivered to Seller duly executed counterparts of each other document, certificate and instrument set forth in Section 2.9(b) to be executed and delivered by Buyer.

(g)    Buyer shall have delivered to Seller evidence reasonably satisfactory to Seller that Buyer has satisfied the covenants set forth in this Agreement. The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Seller, and no Governmental Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(h)    The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari. Notwithstanding anything herein to the contrary, the parties may, in their sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that Buyer is a "Good Faith Purchaser" pursuant to section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section of the Bankruptcy Code.

(i)    The Assigned Contracts shall have been assumed by Seller, as applicable, and assigned to Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code.

The foregoing conditions are for the exclusive benefit of Seller and any such condition may be waived in whole or in part by Seller at or prior to the time of Closing by delivering to Buyer a written waiver to that effect executed by Seller.  Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity Seller may have, including any claims Seller may have for breach of covenant, representation or warranty by Buyer, and also without prejudice to Seller's rights of termination in the event of non-performance of any other conditions in whole or in part.

**ARTICLE 7**
**TERMINATION**

Section 7.1     Termination by the Parties. This Agreement may be terminated at any time prior to the Closing Date:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer by written notice to Seller if:

(i)     the Bankruptcy Court has not entered the Sale Order on or before January 28, 2022;

(ii)     the Closing has not occurred on or prior to January 31, 2022  (the "Drop Dead Date"), except that the right to terminate this Agreement under this Section 7.1(b)(i) shall not be available to Buyer if Buyer's failure to fulfill any of Buyer's covenants or obligations or if the breach of any of Buyer's representations and warranties under this Agreement, as applicable, has been the cause of, or resulted in, the failure of the Closing to occur by the Drop Dead Date;

(iii)     any of the conditions set forth in Section 6.1 or Section 6.2 shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that Buyer is not then in breach of this Agreement so as to cause any of the conditions in Section 6.1 or Section 6.2 not to be satisfied;

(iv)     the Sale Order, once entered, is changed in a manner that is materially adverse to Buyer without the consent of Buyer in its reasonable discretion;

(v)     Seller seeks to have the Bankruptcy Court enter an order dismissing the Chapter 11 Cases of Seller or converting it to a case under chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Chapter 11 Cases of Seller or converting the Chapter 11 Cases of Seller to a case under chapter 7 of the Bankruptcy Code, or appoints a trustee in Seller's Chapter 11 Cases or an examiner with enlarged powers relating to the operation of Seller's businesses, and such dismissal, conversion or appointment is not reversed or vacated within three Business Days after the entry thereof; or

(vi)     There is any Material Adverse Effect.

(c)     by Seller by written notice to Buyer if there is no Material Adverse Effect and Buyer is not otherwise entitled to Terminate this Agreement in accordance with Section 7.1(b) and:

(i)     the Closing has not occurred on or prior to the Drop Dead Date, except that the right to terminate this Agreement under this Section 7.1(c)(i) shall not be available to Seller if any of the provisions of Section 7.1(b) have occurred or are applicable, or if Seller's failure to fulfill any of Seller's covenants or obligations or if the breach of any of Seller's representations and warranties under this Agreement, as applicable, has been the cause of, or resulted in, in whole or in part, the failure of the Closing to occur by the Drop Dead Date; or

(ii)     any of the conditions set forth in <u>Section 6.3</u> shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that Seller is not then in breach of this Agreement so as to cause any of the conditions in <u>Section 6.3</u> not to be satisfied.

(d)     by Buyer or Seller in the event that:

(i)     any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or causing the transactions contemplated by this Agreement to be rescinded following completion thereof, and such Governmental Order shall have become permanent, final and non-appealable;

(ii)     there shall be enacted or made applicable any Law that makes the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(iii)     a court issues a final non-appealable order that prevents Seller from selling the Purchased Assets to Buyer.

Section 7.2     <u>Effect of Termination</u>.

(a)     In the event of termination by either party hereto of this Agreement pursuant to this <u>ARTICLE 7</u>, written notice thereof shall as promptly as practicable be given to the other party and thereupon this Agreement shall terminate and the transactions contemplated hereby shall be abandoned without further action by the parties hereto.  In the event of the termination of this Agreement pursuant to <u>Section 7.1(a)</u> or <u>Section 7.1(d)</u>, except as provided in <u>Section 7.2(b)</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto.  Upon termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the Government Authority to which they were made.

(b)     Notwithstanding any other provisions of this Agreement, if this Agreement is terminated (whether by a party or automatically or otherwise), the provisions of <u>Section 5.7</u>, <u>ARTICLE 6</u>, <u>ARTICLE 7</u>, <u>Section 8.33</u>, <u>Section 8.11</u>, and <u>Section 8.122</u> (subject to any time limitations referred to therein) shall survive such termination and remain in full force and effect, along with any other provisions of this Agreement which expressly or by their nature survive the termination hereof.

## ARTICLE 8
## MISCELLANEOUS

Section 8.1     <u>Survival</u>.  Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall expire and be of no further force and effect as of the Closing and no party hereto shall thereafter have any liability whatsoever with respect thereto; <u>provided</u>, <u>however</u>, that the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the parties hereto following the Closing shall survive in accordance with their respective terms. Following the Closing Date with respect to the representations, warranties, and agreements contained in this Agreement or in any instrument delivered pursuant to this Agreement and, with respect to the covenants contained in this Agreement or in any instrument delivered pursuant to this Agreement, following the applicable survival date of such covenant, such representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall terminate and be of no further force or effect and no party hereto shall have any liability with respect thereto.<u>Expenses; Attorneys' Fees</u>.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and

expenses, whether or not the Closing shall have occurred.  In the event that Buyer or Seller brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each party in that action or proceeding shall bear its own attorneys' fees, costs and expenses (including all court costs and reasonable attorneys' fees).

Section 8.3      Notices.  All notices, requests, consents, claims, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt), (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (d) when received by the addressee if mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.3):

If to Seller:                  NITROcrete LLC.
                               Attn:  Stephen DeBever
                               Email: sdebever@nitrocrete.com

with a copy to:                Markus Williams Young & Hunsicker LLC
                               1775 Sherman Street
                               Suite 1950
                               Denver, Colorado 80203
                               Attn:  James T. Markus
                               Email:  jmarkus@markuswilliams.com

If to Buyer:


with a copy to:


Section 8.4      Interpretation.  For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation", (b) unless the context otherwise requires, the word "or" is not exclusive, and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (i) to Articles and Sections mean the Articles and Sections of this Agreement, (ii) to Schedules mean the Schedules attached to the Disclosure Schedules, (iii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time, if applicable, to the extent permitted by the provisions thereof, and (iv) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  Each of the individuals executing this Agreement and any agreement, document or instrument related hereto is doing so on behalf of the applicable entity, in his or her capacity as an authorized representative of such entity and is not doing so in his or her individual capacity.

Section 8.5      Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 8.6      Severability. Any term, provision, or paragraph of this Agreement which is determined in any jurisdiction to be prohibited, unenforceable, illegal, void, voidable, or unenforceable

shall not affect any other term or provision of this Agreement so long as the economic or legal substance of the transactions contemplated hereby does not constitute a Material Adverse Effect.

Section 8.7    Entire Agreement. This Agreement and the Confidentiality Agreement constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

Section 8.8    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Seller may not assign its rights or delegate its obligations hereunder without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.  Buyer may not assign this Agreement to an affiliate of Buyer prior to or subsequent to Closing without the prior consent of Seller. An authorized Assignment and delegation shall relieve the assigning party of any of its obligations hereunder provided that each such assignee and delegate assumes all such obligations in writing.

Section 8.9    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.10    Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 8.11    Governing Law; Submission to Jurisdiction; Venue. This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Laws of the State of Colorado, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code.  With the exception of any appeals, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

Section 8.12    Limitation on Damages. In no event shall any party be liable to any other party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement or diminution of value or any damages based on any type of multiple.

Section 8.13    Disclosure Schedules. The information in the Disclosure Schedules constitutes exceptions or qualifications to representations and warranties of Seller as set forth in this Agreement. Any disclosure made in the Disclosure Schedules shall be deemed to be disclosures made with respect to all representations and warranties contained in this Agreement to the extent reasonably apparent on their face, regardless of whether or not a specific cross-reference is made thereto.  No disclosure on the Disclosure Schedules relating to a possible breach or violation of any Contract or Law shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

Capitalized terms used in the Disclosure Schedules that are not defined therein shall have the meaning given them in this Agreement.

Section 8.14    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  Any party's failure to provide an original signature shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 8.15    Non-Recourse.   No past, present or future stockholder, director, officer, employee, or incorporator of Seller or Buyer shall have any liability for any obligation or liability of Seller or Buyer, as the case may be, under this Agreement or for any claim, counter-claim, cause of action or demand based on, in respect of, or by reason of, the transactions contemplated by this Agreement.

Section 8.16    Advice of Counsel.   Each of Seller and Buyer acknowledges that it has discussed with its counsel, and has obtained adequate information concerning the relevant implications, advantages, and risks of, and reasonably alternatives to, the waivers, permissions and other provisions of this Agreement.

*[Signature Page Follows]*

The parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

NITROcrete, LLC

By:_____
Name:
Title:

NITROcrete IP, LLC

By:_____
Name:
Title:

NITROcrete Equipment, LLC

By:_____
Name:
Title:

NITROcrete, Holdings, LLC

By:_____
Name:
Title:

Nitro Holdings, LLC

By:_____
Name:
Title:

**BUYER:**

By:_____
Name:
Title:

{Z0377059/1 }

**Schedule 2.1(a)**
**Assets and Tangible Property**

*NITROcrete, LLC*

Fishbowl License
NITROVision
SOLIDworks Software
COMPUTER EQUIPMENT (includes monitors/stands, printers, scanners)
35 Computers
9 iPads
Google Conferencing System
Conference Room TV
Welders for Service Trucks
Hyundai Forklift
Bandsaw
2 Emerson Flow Meters
Forced Air Oven and Clamping Screen Shaker
Conveyor Variable-Speed, 90V DC, 22 Feet Long, 24" Wide Belt
Nitrogen Storage Vessel and Roller Base Platform
Rolling Tool Kit
8 CH Thermocouple C Series Module
MC060: Temp/Humidity Chamber
NI-9124 C Series Temp Input Module 16 Ch
Pump for Trailer Tanks
2 DESKS
2 CONFERENCE TABLES
KITCHEN FRIDGE
Meeting/Break F&F Other
10 Meeting/Break Chairs
8 Meeting/Break Stools
4 Common Lounge Chairs
14 Common Stools
6 Common i2i Chairs
Common F&F Other
2 Office SW 1 Chairs
2 Office SW 1 (5 Star) Chairs
5 Office Gesture Chairs
7 Office Monitor Arms
14 Office Shelf Organizers
7 Office Storage Files
7 Office Tower Drawers
7 Office Desks
Office F&F Other
Partners Lounge Table
5 Partners Lounge Stools
8 Workstation Tower Shelfs
8 Workstation Gesture Chairs
8 Workstation Panels and Windows
8 Workstation Monitor Arms
8 Workstation Worksurface and Whiteboards
Workstation F&F Other
12 Conference Room Chairs
12 Steelcase Plastic Back Chairs

**Site Upgrades**

Site Upgrades - Conco Companies: Hollister
Site Upgrades - Hahn Ready Mix: Moline
Site Upgrades - Lafarge: Fort Totten Dry
Site Upgrades - Lafarge: Fort Totten Wet
Site Upgrades - Lafarge: McKinney A
Site Upgrades - Martin Marietta: Green 1
Site Upgrades - Martin Marietta: Kirby
Site Upgrades - Martin Marietta: Lawnwood
Site Upgrades - Martin Marietta: O'Connor
Site Upgrades - Lafarge: Chantilly
Site Upgrades - Lafarge: Manassas
Site Upgrades - Lauren Concrete: Austin South
Site Upgrades - Round Rock (Lauren)
Site Upgrades - Lehigh Hanson CAD: N Vancouver Remple Bros
Site Upgrades - Martin Marietta: Celina
Site Upgrades - Martin Marietta: Corinth
Site Upgrades - Martin Marietta:Port Arthur
Site Upgrades - Ozinga Ready Mix Concrete: McCook
Site Upgrades - Ready Mix: Graestone
Site Upgrades - Cemex: Losee Wet
Site Upgrades - Martin Marietta:Euless
Site Upgrades - Martin Marietta:Lewisville
Site Upgrades - Richardson
Site Upgrades - Spangler
Site Upgrades - Ozinga Chinatown
Site Upgrades - Oak Creek
Site Upgrades - Lafarge: Everret
Site Upgrades - Lafarge: Waltham
Site Upgrades - Lehigh Hanson: Mesa
Site Upgrades - Stoneway Concrete: Houser
Site Upgrades - Not Commissioned
Site Upgrades - Argos:Armour Drive
Site Upgrades - Cemex: Downtown
Site Upgrades - Cemex: Midtown
Site Upgrades - Ready Mix: Graestone
Site Upgrades - Lafarge:Bladensburg
Site Upgrades - Lafarge:Fort Totten Dry
Site Upgrades - Lafarge:Fort Totten Wet
Site Upgrades - Lafarge-CAD:Spy Hill (Calgary)
Site Upgrades - Lauren Concrete:Round Rock (Lauren)
Site Upgrades - Martin Marietta:Kirby
Site Upgrades - Martin Marietta:Lewisville
Site Upgrades - Ozinga Ready Mix Concrete:Chinatown
Site Upgrades - Ozinga Ready Mix Concrete:McCook
Site Upgrades - Thomas Concrete, Inc:Atlanta (Thomas)
Site Upgrades - Thomas Concrete, Inc:Atlanta, Buckhead
Site Upgrades - Thomas Concrete, Inc:Powdersville
Site Upgrades - VCNA Prairie, LLC:Des Plaines (Yard 8)
Site Upgrades - Dolese:North Broadway
Site Upgrades - Hahn Ready Mix Company:Moline
Site Upgrades - Knife River Materials:Waco
Site Upgrades - Lauren Concrete:Lauren Austin South
Site Upgrades - Lehigh Hanson-CAD:North Vancouver, Remple Bros.
Site Upgrades - Martin Marietta:Spangler
Site Upgrades - US Concrete:Kennendale

Site Upgrades - VCNA Superior Materials, LLC:Hoover (Plant 2)
Site Upgrades - VCNA Superior Materials, LLC:W Jefferson (Plant 32)
Site Upgrades - Lafarge:Kirby Road
Site Upgrades - Lafarge:Rockville East
Site Upgrades - TEC-Crete Transit: Ridgewood
Site Upgrades - Argos: Red Oak

**NAT Units:**
NAT 250D - 321 MM Corinth
NAT 250W - 325 US Concrete
NAT 350 - 328 Stoneway Houser
NAT 150D - 329 Lafarge Rockville West
NAT 150W - 331 FC R&D
NAT 150 LAFARGE BELTSVILLE
NAT 150 LAFARGE BLADENSPURG
NAT 150 LAFARGE FORT TOTTEN DRY
NAT 150 LAFARGE FOR TOTTEN WET
NAT 150 LEHIGH HANSON MESA
NAT 150 LEHIGH HANSON REMPEL
NAT 150 DOLESE
NAT 150 LAFARGE KIRBY ROAD
NAT 150 LAFARGE ROCKVILLE EAST
NAT 150 LAFARGE TORONTO
NAT 150 MARTIN MARIETTA FORT WO
NAT 150 MARTIN MARIETTA GREEN A
NAT 150 MARTIN MARIETTA GREEM B
NAT 150 MARTIN MARIETTA ROUND R
NAT 150 STONEWAY MARGINAL WAY
NAT 150 THALLE CONSTRUCTION
NAT 150 LAFARGE EVERETT
NAT 150 Alamo Corpus North
NAT 150 Alamo Corpus South
NAT 150 Alamo Ingleside
NAT 150 Hahn Davenport River
NAT 150 Hahn Moline Bridge
NAT 150 Dolese Midtown
NAT 150 Dolese Midwest City
NAT 150 Dolese Yukon
NAT 150 Lafarge Manassas
NAT 150 Lafarge McKinney 1
NAT 150 Lafarge McKinney 2
NAT 150 Lauren Round Rock
NAT 150 Lauren South
NAT 150 Cemex Knoxville
NAT 150 Lafarge Chantilly
NAT 150 Martin Celina
NAT 150 Martin Port Arthur
NAT 150 Martin Richardson
NAT 150 Ozinga Chinatown
NAT 150 Wayne Davis Rockmart
NAT 150 Graestone Langley
NAT 150 Martin San Antonio-Ocon
NAT 150 Ozinga Oak Creek
NAT 150 Wayne Davis Douglasvill
NAT 150 Martin Spangler
NAT 150 Martin Euless

NAT 150 Ozinga McCook
NAT 150 Martin Grand Parkway
NAT 150 Thomas SC
NAT 150 Lafarge Waltham
NAT 150 Martin San Antonio-Kirby
NAT 150 Martin Lewisville
NAT 150 Lafarge Saugus
NAT 150 Cemex Navigation A
NAT 150 Lafarge Calgary
NAT 150 Central Concrete Queens Lane
NAT 150 Cemex Baytown
NAT 150 Argos Bayport
NAT 150 Las Vegas Losee
NAT 150 Lafarge Commiss #2
NAT Thomas Buckhead
NAT AZ Materials 43rd Ave
NAT AZ Materials Dobson
NAT US Concrete Maspeth
NAT AZ Materials Glendale
NAT AZ Materials Sacaton
NAT Cemex Sloan
NAT VCNA Prairie Bridgeview
NAT VCNA Superior Hoover
NAT VCNA Superior Jefferson
NAT Lehigh River Ranch
NAT Lafarge Wilson
NAT Martin Marietta Grand Parkway 2
NAT Thomas Atlanta
NAT Thomas Powdersville
NAT Anderson Concrete: Plant 1
NAT Argos: Armour Drive
NAT Burnco
NAT Cemex: Alpharetta
NAT Cemex: Downtown
NAT Cemex: Midtown
NAT Desert Ready Mix: Plant 10 Alma School
NAT Desert Ready Mix: Plant 5 Camelback
NAT Desert Ready Mix: Plant M1 Buckeye
NAT Thomas Concrete: Gaffney
NAT US Concrete: Frisco
NAT Argos: Red Oak
NAT Argos: Saginaw
NAT Cemex: 19th Ave
NAT Cemex: 19th Ave Dry
NAT Knife River: Waco
NAT Dos Bocas Plant 1
NAT Dos Bocas Plant 2
NAT Supermix Plant 1
NAT Lauren: LaGrange
NAT Argos: Glenwood
NAT Anderson Plant 6
NAT Cemex:7th Street
NAT Cemex:West
NAT Cemex:Coolidge
NAT Cemex:Higley
NAT Cemex:Maricopa

NAT Cemex:San Tan
NAT Chaney Enterprises:Harry Nice Bridge
NAT Chaney Enterprises:Seat Pleasant
NAT Chaney Enterprises:Upper Marlboro
NAT Chaney Enterprises:Waldorf - Dry
NAT VCNA Prairie LLC: Bridgeview (Yard1)
NAT Argos Berlin Road
NAT Argos Doraville
NAT Argos Macon
NAT Argos Charleston
NAT Cemex Apache Junction
NAT Cemex Sun City
NAT Lafarge CAD Mavis Road
NAT Lehigh Hanson Sacaton
NAT Vulcan Queens Chapel
NAT VCNA Superior Materials, LLC Plant 36 (Auburn Hills)
NAT VCNA Superior Materials, LLC Plant 101 (Mount Clemens)
NAT Argos Ellington
NAT Argos Holmes Road
NAT Argos Renwick
NAT Thomas Concrete, Inc. Ben Hill
NAT Vulcan Brooklyn
NAT TEC-Crete Ridgewood
NAT Cemex Portable 1
NAT Cemex Portable 2
NAT Golden Pass LNG 1
NAT Golden Pass LNG 2
NAT Cemex:Kyle Canyon
NAT US Concrete:Jenna

**Tanks and Tank Improvements**
NB 5766 15100 Gallon Tank
SN 55838 1-9 20000 Gal W/ Pres
N13010 9400 Gallon Tank and Improvements
N13014 9400 Gallon Tank and Improvements
N13015 9400 Gallon Tank and Improvements
N13013 9400 Gallon Tank and Improvements
NB 6484 10500 Gallon Tank
NB 9005 10500 Gallon Tank
NB 9586 10500 Gallon Tank
NB 772 10500 Gallon Tank
NB 928 10500 Gallon Tank
SN 131 6000 Gallon Tank
NB 1155 10500 Gallon Tank
Other Miscellaneous Tank Parts
N13023 10,900 Gallon Tank and Improvements
N13028 10,900 Gallon Tank and Improvements
N13029 10,900 Gallon Tank and Improvements
SN S1874 13,000 Gallon Tank
N13022 10,900 Gallon Tank
N13025 10,900 Gallon Tank
N13011 9,400 Gallon Tank
N13016 9,400 Gallon Tank
N13019 10,900 Gallon Tank

**Trucks**
2018 Ram 3500 (1640)
2018 Ram 3500 (2821)
2019 Ford F150 (3394)
2019 Ford F-150 (7192)
2019 Ford F-150 (9121)
2019 Ford F150 (3283)
Mixer Truck
2018 Ram 3500 (6556)
2019 Ram 3500 (1749)
2020 Ford F150 XLT 1FTEW1C58LKD28325

**Prepaids/Deposits**
Security Deposit for OfficeWorks Harmony Location
Emkay Fleet Services Deposit
NV Dept of Revenue Tax Refund
Receivable from Peak-Nitro
World of Concrete 2021 Prepayment
SecureDocs (Contract Works) Annual subscription
Prepaid MSFT
Travel Program annual subscription
NRMCA Dues
TXACA
Construct Connect Subscription
Compulab Sensors Prepayment/Deposit
Timberline Warehouse Lease Prepaid  Rent
JAMF (software service)
Solidworks License Renewal

**AR Other**
The below customers have outstanding install fees to be billed as a surcharge
related to future liquid nitrogen deliveries
Cemex 19th Ave - Dry
Cemex - 7th Street
Cemex - Apache Junction
Cemex - West
Cemex - Coolidge
Cemex - Higley
Cemex - Maricopa
Cemex - San Tan
Cemex - Sun City
Cemex - Kyle Canyon

See Schedule 2.1(e) and Schedule 2.1(h)

**Schedule 2.1(b)**
**Leased Property**

1925 Timberline Dr. Fort Collins, CO (lease on Schedule 3.5(a))

2580 E. Harmony Road Suite 301 Fort Collins, CO (lease on Schedule 3.5(b)

**Schedule 2.1(c)**
**Assigned Contracts**

Schedule 2.1(c) of Assigned Contracts forthcoming.

**<u>Schedule 2.1(d)</u>**
**Permits**

None.

**Schedule 2.1(e)**
**Intellectual Property**

**Trademark Applications**

## COOLING SYSTEM AND METHOD

Inventors: Mark Nelson, Drew Nelson
Applicant: NITROcrete IP, LLC

| Polsinelli No. | Type | Application No. | Filing Date | Priority info | Status |
|---|---|---|---|---|---|
| 108371-662806 (0106003USP) | Nonprovisional | 15/882,795 | January 29, 2018 | 62/467,456 62/520,550 | Pending |
| 108371-703973 | Continuation-in-Part | TBD | TBD | 15/882,795 62/467,456 62/520,550 | Drafting |
| 108371-662803 (0106003PCT) | International | PCT/US2018/015801 | January 29, 2018 | 62/467,456 62/520,550 | Nationalized |
| 108371-662809 (0106003-PCT-US) | National Phase - United States | 16/492,101 | September 6, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Pending |
| 108371-662805 (0106003-PCT-AU) | National Phase - Australia | 2018230528 | September 20, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Pending |
| 108371-662804 (0106003-PCT-CA) | National Phase - Canada | 3055310 | September 4, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Pending |
| 108371-662802 (0106003-PCT-EP) | National Phase - Europe | 18763966.1 | October 4, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Pending |
| 108371-662800 (0106003-PCT-IL) | National Phase - Israeli | 269165 | September 6, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Pending |
| 108371-662801 (0106003-PCT-JP) | National Phase - Japan | 2019-549414 | September 5, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Abandoned |
| 108371-662797 (0106003-PCT-KR) | National Phase - South Korea | 10-2019-7028837 | October 1, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Abandoned |
| 108371-662799 (0106003-PCT-MX) | National Phase - Mexico | MX/a/2019/010328 | August 29, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Pending |
| 108371-662798 (0106003-PCT-ZA) | National Phase - South Africa | 2019/06048 | September 12, 2019 | PCT/US2018/015801 62/465,456 62/520,550 | Issued |
| 108371-662807 (0106003PRV) | Provisional | 62/467,456 | March 6, 2017 | -- | Converted |
| 108371-662808 (0106003PRV2) | Provisional | 62/520,550 | June 15, 2017 | -- | Converted |

## LIQUID NITROGEN DISPENSING HEAD

Inventors:  Eric Van Dixhorn; John Gebhart; Michael Schauer; Drew Nelson
Applicant: NITROcrete IP, LLC

| Polsinelli No. | Type | Application No. | Filing Date | Priority info | Status |
|---|---|---|---|---|---|
| 108371-659500 | Nonprovisional | 17/323,940 | May 18, 2021 | 63/027,319 | Pending |
| 108371-691221 | International | PCT/US2021/033238 | May 19, 2021 | 17/323,940 63/027,319 | Pending |
| 108371-659499 | Provisional | 63/027,319 | May 19, 2020 | -- | Converted |

## AGGREGATE PLOW ASSEMBLY

Inventors:  Eric Van Dixhorn; Matthew Zion; Cameron Wilson; Shawn Raffelson; Christopher Annis
Applicant: NITROcrete IP, LLC

| Polsinelli No. | Type | Application No. | Filing Date | Priority info | Status |
|---|---|---|---|---|---|
| 108371-662966 | Nonprovisional | 17/351,978 | June 18, 2021 | 63/041,628 | Pending |
| 108371-694192 | International | PCT/US2021/038098 | June 18, 2021 | 63/041,628 | Pending |
| 108371-661269 | Provisional | 63/041,628 | June 19, 2020 | -- | Converted |

## AGGREGATE LOAD SENSOR

Inventor:  Eric Van Dixhorn
Applicant:  NITROcrete IP, LLC

| Polsinelli No. | Type | Application No. | Filing Date | Priority info | Status |
|---|---|---|---|---|---|
| 108371-662967 | Nonprovisional | 17/370,909 | July 8, 2021 | 63/049,564 | Pending |
| | International | PCT/US2021/040942 | July 8, 2021 | 63/049,564 | Pending |
| 108371-662580 | Provisional | 63/049,564 | July 8, 2020 | -- | Converted |

## SYSTEM AND METHOD FOR ESTIMATING CONCRETE PROPERTIES

Inventors:  Eric Van Dixhorn, Drew Nelson, Cameron Wilson

| Polsinelli No. | Type | Application No. | Filing Date | Priority info | Status |
|---|---|---|---|---|---|
| 108371-667144 | Nonprovisional | 17/463,171 | August 31, 2021 | 63/072,791 | Pending |
| 108371-701071 | International | PCT/US2021/048499 | August 31, 2021 | 63/072,791 | Pending |
| 108371-667000 | Provisional | 63/072,791 | August 31, 2020 | -- | Converted |

**Trademarks**

## NITROCRETE

| Polsinelli No. | Type | Country | Application No. | Filing Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|---|
| 108371-661837 | Trademark | US | 90/029,146 | June 30, 2020 | 6437242 | August 3, 2021 | Registered |
| 108371-674399 | Madrid | WO | A0100148 | September 11, 2020 | 1561035 | September 11, 2020 | Registered |
| 108371-667891 | Designated | BR | 1561035 | September 11, 2020 | | | Pending |
| 108371-667893 | Designated | MX | 1561035 | September 11, 2020 | | | Pending |
| 108371-667894 | Designated | SG | 1561035 | September 11, 2020 | 1561035 | September 11, 2020 | Registered |

## NITROCRETE and DESIGN

| Polsinelli No. | Type | Country | Application No. | Filing Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|---|
| 108371-662331 | Trademark | US | 90/029,153 | June 30, 2020 | | | Pending |
| 108371-662331WO | Madrid | WO | A0100159 | September 11, 2020 | 1573258 | September 11, 2020 | Registered |
| 108371-667895 | Designated | BR | 1573258 | September 11, 2020 | | | Pending |
| 108371-667896 | Designated | MX | 1573258 | September 11, 2020 | | | Pending |
| 108371-667897 | Designated | SG | 1573258 | September 11, 2020 | | | Pending |

**Websites**

nitrocrete.com

coldconcrete.com

nitroconcrete.com

natiscool.com

natconcrete.com

natcooling.com

bestconcretecooling.com

peaknitro.com

peakequipmentleasing.com

symmetryoilfield.com

peak-innovations.com

peak-companies.com

**NITROvision and related internal use software**

**Trade secrets involved in the Business**

**Specifications, drawings, renderings, schematics, design and production details involved in the Business**

**Common law trademark and service mark rights, and associated goodwill, in the marks:**

NITROCRETE

**PEAK INNOVATIONS**

**PEAK**

**NITROVISION**

**NAT**

**Copyright ownership of the code for the NITROVISION software program.**

**Copyright ownership of the code for the NAT Programmable Logic Controller (PLC) software**

**See Schedule 2.1(h).**

**Schedule 2.1(f)**
**Inventory**

| Fort Collins Head Quarters | | Quantity |
| --- | --- | --- |
| **Bolt Rack 1 Shelf 1** | | |
| FCS131 | DeWalt 3/4" x 10" ScrewBolt | 40 ea |
| FCS535 | Pipe-Away Adapter 1/4" NPT | 2 ea |
| FCS671 | AutoSnap 1/2" gas tube fitting | 72 ea |
| FCS787 | Anchor 3/8 X 3-3/4 | 500 ea |
| FCS788 | Anchor 1/2 X 4-1/2 | 400 ea |
| **Bolt Rack 1 Shelf 2** | | |
| FCS2089 | Hose Clamps 11/16" to 1-1/4" Clamp ID | 50 ea |
| FCS230 | 3/8" x 3/8" Hose x MIP Brass hose barb | 41 ea |
| FCS234 | 3/8" stainless 'T' | 71 ea |
| FCS267 | NIP BRS 3/8" Close | 72 ea |
| FCS270 | 3/8" Brass Hose Mender | 48 ea |
| FCS276 | Hose Clamps | 294 ea |
| FCS349 | 2" As Rigid pipe clamp | 23 ea |
| FCS545 | 2" Stainless Steel threaded coupler | 12 ea |
| FCS68 | 3/8" ball valve | 26 ea |
| **Bolt Rack 1 Shelf 3** | | |
| FCS1333 | InLine Tee Reducer 1/2" to 3/8" | 12 ea |
| FCS167 | 2" x close stainless nipple | 5 ea |
| FCS237 | 1850 connector | 7 ea |
| FCS261 | 3/8" Barbed Brass 'T' | 9 ea |
| FCS400 | 3/8" SS Coupler | 56 ea |
| FCS471 | 5/16" Stover nuts | 416 ea |
| FCS555 | Brass adapter for 3/8" hose 1/4 NPTF Male | 215 ea |
| FCS601 | 2" 150# TYPE 304 SS 90 ELL | 7 ea |
| FCS717 | 1/2 X 1/4 304 SS BUSHING | 73 ea |
| **Bolt Rack 1 Shelf 4** | | |
| FCS229 | 2" yellow gasket | 34 ea |
| FCS2345 | 1 1/2" Yellow Gasket | 15 ea |
| FCS557 | 3"  Yellow Gasket | 93 ea |
| FCS833 | LOX-8 1LB Jar | 6 ea |
| FCS910 | 2" Long Corner Bracket | 46 ea |
| FCS973 | Gasket Spiral 150LB 4" | 48 ea |
| **Bolt Rack 2 Shelf 1** | | |
| FCS20 | Rosemount Sensor | 6 ea |
| FCS221 | Blue ethernet | 20 ea |
| FCS272 | Anti Seize #IST17063 packet | 300 ea |
| FCS345 | Nitrogen Sticker 7" X 3" | 9 ea |
| FCS376 | Driver Maintain Preasure 10" x 5.5" | 12 ea |
| FCS390 | .060 Magnet | 90 ea |
| FCS486 | 1.5" x 37 Yard Roll PVC Tape White | 101 ea |
| FCS552 | Copper Pipe Insulating Foam Tank Kits | 21 ea |
| FCS67 | NITROCRETE Spare Parts Label | 4 ea |
| FCS773 | E-Stop | 21 ea |
| FCS789 | Coaxial Cable Male to Male 16.4' | 10 ea |
| FCS790 | Drill Bit 7/16 X 5-1/2 PK6 | 3 ea |
| FCS830 | Drill Bit 1/2 X 6 PK6 | 9 ea |
| FCS831 | Compression Fitting, Union SS 1/2 | 11 ea |
| | Union 304 SS 1/2 | |
| **Bolt Rack 2 Shelf 2** | | |
| FCS110 | 16GB SD card | 17 ea |
| FCS111 | Solid state relay | 2 ea |
| FCS132 | Antenna extension | 62 ea |
| FCS156 | 120V relay | 11 ea |
| FCS161 | Red prime switch | 5 ea |
| FCS171 | 24V relay | 23 ea |
| FCS184 | 120V outlet | 47 ea |
| FCS236 | Black ethernet cable | 20 ea |
| FCS279 | Terminal end cap PK50 | 26 ea |
| FCS282 | Terminal blocks | 84 ea |

| | | |
|---|---|---|
| FCS29 | Digi accessory kit | 23 ea |
| FCS316 | Enclosure Lock | 36 ea |
| FCS317 | Load Cell Summing Card | 16 ea |
| FCS335 | Terminal Jumpers (Orange Jumper) PK100 | 181 ea |
| FCS336 | DIGI - WR11 | 6 ea |
| FCS352 | Bolt 3/8" X 2" | 721 ea |
| FCS40 | Electronic Timer Dial | 2 ea |
| FCS48 | Analog module | 7 ea |
| FCS480 | Flex Conduit | 261 ft |
| FCS580 | Power Supply 10W 5VDC DIN | 1 ea |
| FCS720 | Yellow Ring Terminal 12-10 AWG PK100 | 4 ea |
| FCS721 | Red Ring Terminal 20-18 AWG PK100 | 1 ea |
| FCS76 | Relay socket | 96 ea |
| FCS829 | 24V DC Ice Cube Relay | 7 ea |
| FCS856 | SMA Make Crimp Connector | 7 ea |
| FCS896 | THROUGH PANEL MOUNT SOCKET | 3 ea |
| FCS897 | PANEL MOUNT ADAPTOR | 4 ea |
| FCS898 | Round Push Button 1NO | 2 ea |
| FCS93 | E-stop cover | 5 ea |
| **Bolt Rack 2 Shelf 3** | | |
| FCS111 | Solid state relay | 6 ea |
| FCS183 | Power plug end | 124 ea |
| FCS23 | Load Cells | 2 ea |
| FCS26 | Touch Screen | 1 ea |
| FCS36 | PLC (new style) | 10 ea |
| FCS79 | 24V Power supply | 16 ea |
| FCS857 | N Male Crimp Connector | 9 ea |
| FCS895 | TIMER 11-PIN PLUG-IN DPDT 10A | 3 ea |
| TOOL-12 | SDS-Plus Masonry Drill Bit 1/2X6 | 16 ea |
| TOOL-13 | 3/8 Thread Drop in Concrete Anchor | 45 ea |
| **Bolt Rack 2 Shelf 4** | | |
| FCS132 | Antenna extension | 50 ea |
| FCS2444 | SMC AF40-N03-6Z-A filter, AF MASS PRO | 1 ea |
| FCS47 | Super Antenna | 23 ea |
| FCS483 | 3-5/8"" Unistrut Pipe Clamp (Rigid) | 10 ea |
| FCS486 | Copper Pipe Insulating Foam Tank Kits | 85 ea |
| **Bolt Rack 3 Shelf 1** | | |
| FCS2088 | 7/8" ID U-Bolts, 1/4" - 20 Thread size | 16 ea |
| FCS272 | Anti Seize #!ST17063 packet | 125 ea |
| FCS29 | Digi accessory kit | 25 ea |
| FCS302 | WASHER FENDER 3/8" | 1,707 ea |
| FCS560 | Aluminum flat 1/16" Thick x 1-1/2" Wide 6FT | 6 ft |
| FCS818 | Hose Fitting Barbed 3/8 X 1/8 NPTF Male PK10 | 93 ea |
| FCS849 | Brass Plug 1/8 NPT | 17 ea |
| FCS882 | Boot Fabric | 56 ft |
| PEAK-0306 | 3" piping kit | 4 ea |
| **Bolt Rack 3 Shelf 2** | | |
| FCS1008 | MAC Solenoid Valve With Base 4-Way, Single Solenoid | 5 ea |
| FCS2081 | 5/16"-18 x 3/4" Bolt | 40 ea |
| FCS2087 | Steel U-Bolt 3/8"-16 Thread Size, 1-3/8" ID | 38 ea |
| FCS339 | Self Tappers 1/4 X 14 X 1-1/2 | 2,173 ea |
| FCS639 | Digital Output Module | 4 ea |
| FCS823 | Hose Fitting Barbed ¼ TEE PK2 | 11 ea |
| FCS959 | Conduit body aluminum 1/2" with cove and gasket | 8 ea |
| **Bolt Rack 3 Shelf 3** | | |
| FCS1008 | MAC Solenoid Valve With Base 4-Way, Single Solenoid | 32 ea |
| FCS1026 | Flex silver tape | 14 ea |
| FCS149 | Nashua Aluminum Tape | 20 ea |
| FCS2082 | 1" Steel Spacer Plate | 19 ea |

| | | |
|---|---|---|
| FCS2083 | 1/2" Steel Spacer Plate | 22 ea |
| FCS792 | 110v 1/2 Brass Solenoid Closed | 10 ea |
| FCS883 | 1/2-20 Brass Nut | 277 ea |
| FCS884 | 1/2-20 x 2" Full Thread Studs SS 316 | 275 ea |
| FCS959 | Conduit body aluminum 1/2" with cove and gasket | 2 ea |

**Bolt Rack 3 Shelf 4**

| | | |
|---|---|---|
| FCS1003 | Molex DIN Valve Connector | 187 ea |
| PEAK-0106 | Piping Kit | 10 ea |

**Chris's Desk**

| | | |
|---|---|---|
| FCS171 | 24V relay | 1 ea |
| FCS2335 | Solder-Connect Fitting for Copper Tubing | 2 ea |

**Conex Rack 4 Shelf**

| | | |
|---|---|---|
| FCS678 | Gate Valve Lockout - 1"-3" | 16 ea |

**Conex Rack 4 Shelf**

| | | |
|---|---|---|
| FCS760 | Virgin Teflon Gasket 1.5" O2 | 10 ea |
| FCS761 | Virgin Teflon Gasket 2.5" O2 | 7 ea |

**Cryowest Inventory**

| | | |
|---|---|---|
| FCS16 | VJ Flex Hose  2" ID x 20' Long | 9 ea |
| FCS18 | VJ Rigid Pipe  2" ID x 20' Long | 1 ea |
| FCS458 | VJ Flex Hose  3" ID x 10' Long | 3 ea |
| FCS459 | VJ Flex Hose  3" ID x 15' Long | 7 ea |
| FCS7 | VJ Flex Hose  2" ID x 10' Long | 6 ea |
| FCS8 | VJ Flex Hose  2" ID x 15' Long | 16 ea |

**Green Rack 1 Shelf**

| | | |
|---|---|---|
| FCS3084 | 1-1/2" x 3" 304 Stainless Steel Nipple | 1 ea |
| FCS702 | Locking Clevis Pin 1-1/2"X8" | 4 ea |
| FCS703 | T-Handle Clevis Pin 1-1/4"X7" | 4 ea |
| FCS750 | 1/2 150# TYPE 304 SS CAP | 4 ea |
| FCS779 | 1-1/2 Stainless 304 90 | 24 ea |
| FCS780 | Bushing Brass 2X1-1/2 | 13 ea |
| FCS95 | 2" x 6" stainless nipple | 12 ea |

**Green Rack 1 Shelf**

| | | |
|---|---|---|
| FCS1035 | 1-1/2" x 6" SS Nipple | 2 ea |
| FCS199 | 1-1/2" x 4" stainless nipple | 20 ea |
| FCS530 | 3/4" X 16" SCH 40 304/304L WLD SS PIPE TBE | 9 ea |
| FCS669 | 2"X10" 304 Stainless Steel Nipple | 28 ea |
| FCS755 | 3X12 304 SS NIPPLE | 8 ea |
| FCS851 | 2 X 1 304 SS BUSHING | 9 ea |

**Green Rack 1 Shelf**

| | | |
|---|---|---|
| FCS174 | 1-1/2" x 1/2" stainless bushing | 8 ea |
| FCS232 | 1/2" Stainless Steel 'T' 150LB | 35 ea |
| FCS413 | 1/2" SS Coupler | 39 ea |
| FCS529 | 3/4 x 12 SCH 40 TYPE 304 SS NIPPLE | 5 ea |
| FCS563 | 3/4 X 1/4 150# TYPE 304 SS BUSHING | 4 ea |
| FCS674 | 3/4 X1/4 304 Stainless Steel Reducer | 25 ea |
| FCS675 | 1/2" Stainless Steel CL Nipple | 38 ea |
| FCS691 | 1/2 x 3 SCH 40 TYPE 304 SS NIPPLE | 37 ea |
| FCS772 | Nipple SS 1/4 X 12 | 6 ea |
| FCS852 | 1" X 4" 304 Stainless Nipple | 6 ea |
| FCS866 | Reducer, 304 Stainless 1/2 X 3/8 | 26 ea |

**Green Rack 1 Shelf**

| | | |
|---|---|---|
| FCS2051 | 2 X 8 Stainless Nipple | 2 ea |
| FCS2053 | Bushing 304 SS 2 X 1/2 | 3 ea |
| FCS2054 | Bushing 304 SS 2 X 3/4 | 3 ea |
| FCS2055 | Bushing 304 SS 2 X 1-1/2 | 3 ea |
| FCS670 | 1/2 CounterStrike Flexible Gas Tubing 250' | 500 ft |
| FCS967 | 3/4 TYPE 304 SS 90 ELL | 54 ea |

**Green Rack 2 Shelf**

| | | |
|---|---|---|
| FCS2045 | TEE SWT 2 X 2 X 1 | 2 ea |
| FCS2046 | 90 SWT 1-1/2 Short Radius | 4 ea |
| FCS2047 | 2" Copper Cap | 1 ea |

| | | |
|---|---|---|
| FCS2048 | Copper Coupler SWT 1-1/2 | 11 ea |
| FCS2049 | Female SWT Adaptor 1" | 2 ea |
| FCS2050 | 1" 90 SWT Long Radius Street | 2 ea |
| FCS642 | 3" SWT MALE ADPT | 2 ea |
| FCS78 | 2" x 8" brass nipple | 6 ea |
| FCS925 | 2X6 Brass Nipple | 16 ea |

**Green Rack 2 Shelf**

| | | |
|---|---|---|
| FCS408 | 2" SWT Male Adapter | 18 ea |
| FCS449 | 2" SWT Copper Coupler | 2 ea |
| FCS450 | 2" SWT 90 copper SR street | 17 ea |
| FCS451 | 2" SWT 45 copper street | 31 ea |
| FCS637 | 90 LNG RAD FTG ELBOW 2" Street | 17 ea |
| FCS644 | 2" 45 SWT Copper Elbow | 20 ea |
| FCS749 | 2" 90 SWT copper short radius | 6 ea |
| FCS754 | 2" 90 Copper SWT Elbow Long Radius | 7 ea |

**Green Rack 2 Shelf**

| | | |
|---|---|---|
| FCS396 | 3" Copper 45 El street | 15 ea |
| FCS398 | 3" Copper Tee | 4 ea |
| FCS421 | 3" X 2" Reducing Coupler - Male | 8 ea |
| FCS638 | 90 LNG RAD FTG ELBOW 3" Street | 13 ea |
| FCS646 | 3X3X2" Copper SWT TEE | 2 ea |

**Green Rack 2 Shelf**

| | | |
|---|---|---|
| FCS640 | 3" SWT Copper 45 | 11 ea |
| FCS641 | 3 SWT COPPER 90 ELL SR | 1 ea |

**Green Rack 2 Shelf**

| | | |
|---|---|---|
| FCS69 | NAT Riser | 2 ea |
| FCS73 | 2" stainless flange threaded | 49 ea |
| FCS756 | 2 TYPE 304SS BLIND FLANGE | 8 ea |
| FCS880 | 3" 300# RFSO SS 8-bolt flange | 4 ea |
| FCS881 | 3" FLG 316 300# RF BLIND | 10 ea |

**Green Rack 3 Shelf**

| | | |
|---|---|---|
| FCS556 | Plug 1/4 NPTF Male | 87 ea |
| FCS784 | Nipple Schedule 40 Black  1/2 X 2 | 14 ea |
| FCS785 | Nipple Schedule 40 Black 1/2 X 4 | 1 ea |

**Green Rack 3 Shelf**

| | | |
|---|---|---|
| FCS172 | 1/4" x 8" Brass Pipe Nipple | 10 ea |
| FCS238 | 1/4" Rough Brass 'T' | 7 ea |
| FCS239 | 1/4" 90 degree stainless steel 150LB | 8 ea |
| FCS254 | 1/4" Forged Elbow M-M | 62 ea |
| FCS268 | 1/4" Brass Nipple | 36 ea |
| FCS407 | 1/2" SS Half Coupler | 15 ea |
| FCS412 | 1/4" x 2" Brass NIP | 27 ea |
| FCS481 | Coupler 1/4" Stainless | 5 ea |

**Green Rack 3 Shelf**

| | | |
|---|---|---|
| FCS185 | 1/2" Rough Brass 45 Degree M-F | 16 ea |
| FCS2090 | 1/2" NPT 90 degree elbow FemalexFemale | 3 ea |
| FCS2091 | 1/2" NPT 90 Degree Adapter Female x Male | 3 ea |
| FCS245 | 1/2" x 3" Brass Pipe Nipple | 1 ea |
| FCS259 | 1/2" x 1-1/2" Brass Pipe Nipple | 1 ea |
| FCS262 | NIP BRS 1/2" CL | 86 ea |
| FCS633 | 1/2" Rough Brass 90 ST Ell | 7 ea |
| FCS950 | 1/4 SS half Coupler | 12 ea |

**Green Rack 3 Shelf**

| | | |
|---|---|---|
| FCS124 | 2" x 4" SCH40 Type 304 stainless nipple | 2 ea |
| FCS475 | 3X2 SCH10S 304 RED | 1 ea |

**Green Rack 3 Shelf**

| | | |
|---|---|---|
| FCS415 | 3" Stainless Steel Flange | 3 ea |

| | | |
|---|---|---|
| FCS952 | 3" SS BW 90 degree LR | 1 ea |
| **Green Rack 4 Shelf** | | |
| FCS250 | Copper plate anti seize/corrosion | 41 ea |
| **Green Rack 4 Shelf** | | |
| FCS326 | 2" X 4"  Aluminum nipple | 36 ea |
| FCS600 | 2" SWT FEM ADPT 603 WC402 | 1 ea |
| FCS650 | 2"X1-1/2" Stainless reducer  WP-304L BW | 11 ea |
| FCS89 | 2" stainless 'T' F-F weldable | 9 ea |
| **Green Rack 4 Shelf** | | |
| FCS118 | 2" 90 degree stainless Weldable SR | 6 ea |
| **Green Rack 4 Shelf** | | |
| FCS403 | 2" Stainless Lap Flange | 1 ea |
| **Green Rack 4 Shelf** | | |
| FCS74 | 2" stainless flange weldable | 8 ea |
| **Hmi box test** | | |
| FCS20 | Rosemount Sensor | 1 ea |
| FCS580 | Power Supply 10W 5VDC DIN | 1 ea |
| **Kitting Station** | | |
| FCS2082 | 1" Steel Spacer Plate | 2 ea |
| FCS2114 | Standard-Wall 304/304L Stainless Steel Pipe, Threaded on Both Ends, 1 Pipe Size, 24" Long | 4 ea |
| FCS240 | 5050 connector | 86 ea |
| **Limtronik site** | | |
| FCS111 | Solid state relay | 68 ea |
| FCS156 | 120V relay | 13 ea |
| FCS161 | Red prime switch | 20 ea |
| FCS171 | 24V relay | 90 ea |
| FCS22 | Phase Separator - Current | 3 ea |
| FCS307 | NAT Box V6 Painted | 29 ea |
| FCS336 | DIGI  -  WR11 | 2 ea |
| FCS373 | Venting is normal 4" w x 2' H | 45 ea |
| FCS46 | HMI enclosure | 1 ea |
| FCS54 | Ethernet switch | 12 ea |
| FCS67 | E-Stop | 12 ea |
| FCS76 | Relay socket | 41 ea |
| FCS79 | 24V Power supply | 9 ea |
| FCS845 | 1/2" Magnatrol Valve (Gas) | 8 ea |
| FCS93 | E-stop cover | 12 ea |
| **NAT Assembly Area** | | |
| FCS245 | 1/2" x 3" Brass Pipe Nipple | 4 ea |
| FCS259 | 1/2" x 1-1/2" Brass Pipe Nipple | 4 ea |
| FCS288 | 14/3 S.O. Cable 250FT | 432 ft |
| FCS632 | 1/2" Rough Brass 90 ELL Lead Free | 4 ea |
| FCS633 | 1/2" Rough Brass 90 ST Ell | 4 ea |
| FCS687 | 4" NAT Box rubber seal | 5 ea |
| FCS845 | 1/2" Magnatrol Valve (Gas) | 3 ea |
| **Orange Rack 1** | | |
| FCS42 | Braided Flex Hose    2" ID x 5' Long | 5 ea |
| FCS474 | Spare Parts Box | 4 ea |
| PEAK-0108 | Spare Parts Kit | 1 ea |
| **Orange Rack 1 Shelf** | | |
| FCS1338 | 2" x 3' Pipe Insulation | 11 ea |
| FCS1339 | 2" 90° Insulation | 5 ea |
| FCS479 | Cradle Support Pipe - 7' long | 19 ea |
| **Orange Rack 1 Shelf** | | |
| FCS1070 | Belt Load Cell Roller C5 20" | 1 ea |
| FCS1071 | Belt Load Cell Roller Bracket Rise 4.25 | 26 ea |
| FCS2065 | Single Point Load Cell Mounting Bracket, 3" x 3" x 5' Steel Angle 1/4" | 2 ea |

| FCS2067 | Roller Mount Bracket | 3 ea |
| PEAK-0176 | Load Cell Enclosure | 10 ea |

**Orange Rack 2 Shelf**

| FCS127 | Galvanized Sheet 2' x 4' | 59 ea |
| FCS23 | Load Cells | 2 ea |
| FCS890 | Inner Cold tunnel 6" Bent Sheet | 3 ea |
| FCS891 | Inner Cold Tunnel Plate with Holes | 3 ea |

**Orange Rack 3**

| FCS1050 | Inner Cold Tunnel Panel Right Hand | 21 ea |
| FCS1051 | Inner Cold Tunnel Panel Left Hand | 7 ea |
| FCS366 | Cold Tunnel End Flap Rubber | 3 ea |
| FCS472 | COLD TUNNEL END FLAP MOUNT | 1 ea |

**Orange Rack 4 Shelf**

| FCS944 | Sprinkler Head - 15 van with adapter | 20 ea |
| PEAK-0205 | NAT box V6.3 Finished Without Solenoid | 21 ea |

**Orange Rack 5 Shelf**

| FCS1014 | Wall anchor brackets with support | 14 ea |

**Outside**

| FCS13 | VJ Flex Hose  2" ID x 30' Long | 25 ea |
| FCS16 | VJ Flex Hose  2" ID x 20' Long | 4 ea |
| FCS18 | VJ Rigid Pipe  2" ID x 20' Long | 2 ea |
| FCS2 | V4 Conditioner Box | 5 ea |
| FCS369 | L Copper Insulated  Pipe, 2"ID, 20'L w/ 6" PVC Jacket .120 Wall | 24 ea |
| FCS369 FT | L Copper Insulated  Pipe, 2"ID, 20'L w/ 6" PVC Jacket .120 Wall | 58 ft |
| FCS371 | L Copper Pipe, 3"ID,  20'L, w/ 8" PVCJacket .160 wal | 13 ea |
| FCS371 FT | L Copper Pipe, 3"ID,  20'L, w/ 8" PVCJacket .160 wal | 11 ft |
| FCS381 | Skirting Reel | 1,460 ft |
| FCS528 | 1/8"X48"X96" Stainless Steel | 48 ft |
| FCS576 | Steel flat 1/2"X4"X8" | 3 ea |
| FCS578 | Auxiliary Lane Leg Weldment | 4 ea |
| FCS581 | Steel tube 4" X 4" X 3/16" X 86 11/16" | 4 ea |
| FCS583 | Steel flat 1/2" X 4" X 14" | 4 ea |
| FCS584 | Steel flat 1/2" X 6" X 15" | 2 ea |
| FCS586 | Auxiliary Lane A Frame Leg Weldment | 2 ea |
| FCS589 | Steel flat 1/2" X 4" X 15 1/8" Gusset | 2 ea |
| FCS590 | Steel flat 1/2" X 6" X 6" Gusset End Plate | 2 ea |
| FCS591 | Auxiliary Lane A Frame Top Weldment | 1 ea |
| FCS594 | Auxiliary Lane Ring 1/4" | 5 ea |
| FCS595 | Steel Tube 8" X 8" X 1/4" x 43 1/4" | 2 ea |
| FCS613 | King Pin Stand Base Plate | 3 ea |
| FCS614 | King Pin Stand Top Plate 9"X9" | 6 ea |
| FCS647 | Vacuum Jacketed Flex Hose, 2"ID, 50'L | 1 ea |
| FCS648 | Auxiliary Lane Ring 1/8" | 3 ea |
| FCS7 | VJ Flex Hose  2" ID x 10' Long | 1 ea |
| FCS713 | Flat Steel 1/4" x 4" x 10" | 41 ea |
| FCS733 | Flat Steele 1 X 5 X 24" | 8 ea |
| FCS737 | Angle Steele 6 X 6 X 3/8 X 24" | 5 ea |
| FCS741 | Steel Flat 3/16" X 5" X 43-1/2" W/ Holes | 8 ea |
| FCS742 | Steel Tube 7" X 7" X 3/8" X 43-3/4" | 3 ea |
| FCS766 | Vacuum Jacketed Flex Hose, 2"ID, 60'L | 1 ea |
| FCS874 | Plate Steel 1/4" X 48" X 96" | 32 ft |
| FCS875 | Plate Steel 3/8" X 48" X 96" | 32 ft |
| FCS920 | King Pin Welded Assembly | 5 ea |
| FCS981 | Bridge Uprights (Set of two) | 43 ea |
| FCS996 | Trailer Tank Ramps | 5 ea |
| PEAK-0107 | Airhose Adapter Kit | 4 ea |
| PEAK-0142 | NAT Box Assembly V7 Painted | 2 ea |
| PEAK-0174 | Auxiliary Lane Cradle Assembly | 1 ea |

**Outside Steel Rack**

| FCS144 | Galvanized Smooth Rod 6' | 8 ea |
| FCS2122 | Steel Flat 1" x 3" x 20' | 12.5 ft |

| FCS2224 | 5" x 5" x 3/8" x 20' Angle - FT | 3.66667 ft |
| FCS2300 | 5 x 5 x 3/8 Angle | 20 ft |
| FCS319 | 2" Straight SS Pipe 21' | 159.16667 ft |
| FCS328 | Cradle Support Pipe - 5' long | 97 ft |
| FCS402 | 1 5/8 x 1 5/8 Pre-Gal channel 10' | 253.66667 ft |
| FCS425 | Angle Alum 3/16" x 2" x 2" | 32 ft |
| FCS438 | Angle Steel 2" x 2" x 3/16" x 20' | 40 ft |
| FCS4444 | 2" x 2" x 8' Perf Tube | 6 ea |
| FCS447 | 2" type L copper pipe | 48 in |
| FCS547 | PERFORATED TUBE 1 3/4"X1 3/4" 12' | 48 ft |
| FCS548 | PERFORATED TUBE 2"X2" 12' | 24 ft |
| FCS571 | Steel flat 1/2" X 4" X 20' | 58 ft |
| FCS745 | Reinforcing (Rebar) 1/2" X 20' | 164 ft |
| FCS794 | 2" x 2" x 1/4" x 24' Aluminum Tube | 20 ft |
| FCS797 | 2" x 3" x 1/4" x 24' Aluminum Angle | 10 ft |
| FCS850 | 1" Stainless Pipe SCH10 20' | 20 ft |

**Outside Steel Rack**

| FCS100 | Galvanized Perforated Tube 2" - 12' stick | 144 ft |
| FCS101 | Galvanized Perforated Tube 1 3/4" - 12' stick | 72 ft |
| FCS1255 | 4" x 1/4" Flat Bar | 0.5 ft |
| FCS2038 | 10 ft. Hard Straight Copper Tubing, 1 5/8 in Outside Dia., 1.5 in Inside Dia. | 40 ft |
| FCS2092 | 2" Standard Wall SS Unthreaded Weldable Pipe x 10" | 1 ea |
| FCS347 | Unistrut 1 5/8" X 7/8" 10' | 10 ft |
| FCS426 | Flat Steel 1/4" x 2" x 20' | 494.72917 ft |
| FCS428 | Flat Steel 1/4" x 4" x 20' | 20 ft |
| FCS429 | Angle Steel 1/8" x 1" x 1" | 80 ft |
| FCS436 | Flat Steel 1/4" x 3" | 260 ft |
| FCS437 | Flat Steel 1/4" x 5" X 20' | 17.75 ft |

**Outside Steel Rack**

| FCS428 | Flat Steel 1/4" x 4" x 20' | 71.53333 ft |
| FCS581 | Steel tube 4" X 4" X 3/16" X 86 11/16" | 24 ea |
| FCS597 | Steel Angle 3" X 3" X 3/8" X 20' | 195 ft |

**Outside Steel Rack**

| FCS323 | 8" X 4" X 3/16" x 24' Aluminum Stock | 120 ft |
| FCS414 | 3" Stainless Steel Pipe | 27 ft |
| FCS434 | 2" SCH 40 Black Pipe 21 FT | 53 ft |
| FCS564 | Steel tube 4" X 4" X 3/16" X 24' | 48 ft |
| FCS569 | Steel tube 3 1/2" X 3 1/2" X 1/4" X 24' | 85 ft |
| FCS573 | Steel tube 2" X 2" X 1/4" X 20' | 31 ft |
| FCS668 | Steel tube 8" X 4" X 1/4" X 20' | 20 ft |
| FCS723 | Flat Steele 3/8 X 10 X 20' | 30 ft |

**Pre Insulated Pipe**

| FCS371 | L Copper Pipe, 3"ID, 20'L, w/ 8" PVCJacket .160 wal | 10 ea |

**Rack 1 Shelf 1**

| FCS2094 | 3" Standard Wall Unthreaded SS Pipe x 4" | 1 ea |
| FCS2095 | 3" x 2" Thin Wall Butt Weld Unthreaded Pipe Fitting SS | 1 ea |
| FCS251 | Bolt SS 5/8" x 2-1/2" | 1,125 ea |
| FCS344 | Bolt SS 5/8" x 3" | 1,125 ea |
| FCS394 | 1/2" -13 hex nuts Zinc | 5,184 ea |
| FCS404 | 2" Stainless Stub End | 1 ea |

**Rack 10 Floor**

| FCS2084 | Hardware Kit for Load Cell Assembly | 2 ea |
| FCS255 | Skirting 24' | 10 ea |
| FCS278 | 3/8" Air Hose | 405 ft |
| FCS287 | 14/4 SO Cable Spool 1000' | 1,288 ft |
| FCS291 | Cable, Communication 22/4, Shielded - 1000ft | 1,500 ft |
| FCS329 | Skirting 16' | 7 ea |
| PEAK-0108 | Spare Parts Kit | 2 ea |

**Rack 10 Shelf 1**

| | | |
|---|---|---|
| FCS291 | Cable, Communication 22/4, Shielded - 1000ft | 600 ft |

**Rack 10 Shelf 2**

| | | |
|---|---|---|
| FCS2030 | 3/8" X 250', 7x19, Galvanized Cable Reel | 3 ea |
| FCS2031 | 3/8" Cable x 3-1/2" Diameter Flat Mount Block | 39 ea |
| FCS2032 | 3/8" Cable x 3-1/2" Dia Swivel Eye Pulley | 121 ea |
| FCS2033 | 5/8" Shackle 3/4 pin | 77 ea |
| FCS2034 | 3/8 Shackle 1 ton capacity | 12 ea |
| FCS2035 | 3/8 Wire Rope Clip, U-Bolt | 170 ea |
| FCS2036 | 3/8" Heavy Duty Wire Rope Thimble | 52 ea |
| FCS2037 | 2-1/2 U-Bolt 1-1/4 thread | 50 ea |
| FCS994 | Tank Manifold 3" copper to 2" flange w PRV/Gauge | 1 ea |
| FCS997 | Tank Manifold Copper 3" with gauge and PRV | 2 ea |
| PEAK-0171 | Tank Manifold 2" Copper with PRV, | 4 ea |

**Rack 10 Shelf 3**

| | | |
|---|---|---|
| FCS1004 | Tank Manifold 3" copper to 3" 8 bolt flange with PRV/gauge | 4 ea |
| FCS1080 | 3" Tank Manifold PRV Flange Sub Assembly | 4 ea |
| FCS2058 | ACTUATOR 12-SPRING, BLUE END CAPS SR105 | 18 ea |
| FCS2066 | 2" Flanged Candy Cane PRV | 4 ea |
| FCS2096 | 3" Copper Sweat Candy Cane PRV | 4 ea |
| FCS872 | ACTUATOR 12-SPRING, BLUE END CAPS | 2 ea |
| FCS987 | PRV 3" Flanged ; with Drain & Gauge | 6 ea |
| PEAK-0184 | PRV 2" Flanged ; with Drain & Gauge | 1 ea |

**Rack 11 Floor**

| | | |
|---|---|---|
| PEAK-0108 | Spare Parts Kit | 2 ea |
| PEAK-0142 | NAT Box Assembly V7 Painted | 1 ea |

**Rack 11 Shelf 2**

| | | |
|---|---|---|
| FCS159 | Large 1" x 48" Insulation | 34 ft |
| FCS327 | Foam Pipe Insulation | 49 ea |

**Rack 12 Shelf 2**

| | | |
|---|---|---|
| PEAK-0145 | Cold Tunnel Side Panel 45" with Access Door | 13 ea |

**Rack 12 Shelf 3**

| | | |
|---|---|---|
| FCS334 | Flat Bar - CT Skirting 1 1/2" | 49 ea |

**Rack 13 Shelf 2**

| | | |
|---|---|---|
| FCS41 | 2" Nitrogen trailer plug stainless | 5 ea |

**Rack 13 Shelf 3**

| | | |
|---|---|---|
| FCS472 | COLD TUNNEL END FLAP MOUNT | 24 ea |
| PEAK-0134 | Inline Dispensing Head - 5' | 3 ea |
| PEAK-0172 | Inline Dispensing Head - 4' | 4 ea |
| PEAK-0202 | In Line Dispensing Head - 5 foot Side | 1 ea |

**Rack 13 Shelf 4**

| | | |
|---|---|---|
| FCS24 | Magnatrol Valve 1-1/2" 300PSI (Liquid) | 2 ea |
| FCS442 | Perforated Square Tube, Gal Uprights | 12 ea |
| PEAK-0130 | Pipe Bridge LEG Kit - Standard | 1 ea |
| PEAK-0164 | Rack and Cold Tunnel Frame Kit | 2 ea |

**Rack 14 Shelf 2**

| | | |
|---|---|---|
| FCS307 | NAT Box V6 Painted | 3 ea |

**Rack 14 Shelf 3**

| | | |
|---|---|---|
| FCS452 | Cradle | 6 ea |

| | | |
|---|---|---|
| PEAK-0135 | Inline Dispensing Head Mounting Kit | 2 ea |
| PEAK-0174 | Auxiliary Lane Cradle Assembly | 1 ea |
| **Rack 14 Shelf 4** | | |
| FCS1232 | 4" x 1/4" x 11 1/2" Flat Bar | 2 ea |
| FCS534 | Waterfall Head Welded Assembly | 38 ea |
| FCS686 | Auxiliary Lane Waterfall Head | 5 ea |
| PEAK-0199 | Finished NAT box V6-2 | 5 ea |
| **rack 15 shelf 2** | | |
| FCS538 | 1/4" 125 PSI Dewar Safety Pressure Relief Valve | 5 ea |
| FCS80 | 1/4" 150 PSI relief valve | 47 ea |
| **rack 15 shelf 3** | | |
| FCS229 | 2" yellow gasket | 4 ea |
| FCS523 | CRYO ARV, 3/4 MPT X 1 FPT, 150PSIG | 9 ea |
| FCS932 | Plow Sub Assembly | 2 ea |
| **RACK 16 SHELF 3** | | |
| FCS174 | 1-1/2" x 1/2" stainless bushing | 1 ea |
| FCS197 | 3/4" Stainless 'T' | 1 ea |
| FCS563 | 3/4 X 1/4 150# TYPE 304 SS BUSHING | 5 ea |
| FCS923 | 1/2 SCH 40 304 SS HALF NIPPLE | 4 ea |
| **RACK 16 SHELF 4** | | |
| FCS1006 | Flow Tite Pnuematic Ball Valve without Solenoid | 10 ea |
| **RACK 16 SHELF 5** | | |
| FCS880 | 3" 300# RFSO SS 8-bolt flange | 2 ea |
| **RACK 17 SHELF 3** | | |
| FCS640 | 3" SWT Copper 45 | 15 ea |
| FCS921 | 3X2 copper reducing coupler street | 1 ea |
| **RACK 17 SHELF 4** | | |
| FCS765 | 90 SWT Long Turn 3" | 2 ea |
| **RACK 18 SHELF 1** | | |
| FCS556 | Plug 1/4 NPTF Male | 1 ea |
| FCS785 | Nipple Schedule 40 Black 1/2 X 4 | 14 ea |
| **RACK 18 SHELF 2** | | |
| FCS239 | 1/4" 90 degree stainless steel 150LB | 1 ea |
| FCS254 | 1/4" Forged Elbow M-M | 2 ea |
| FCS412 | 1/4" x 2" Brass NIP | 7 ea |
| **Rack 19 Shelf 5** | | |
| FCS73 | 2" stainless flange threaded | 78 ea |
| **Rack 2 Floor** | | |
| PEAK-0177 | 3" Custom "Y" Candlestick | 2 ea |
| **Rack 2 Shelf C** | | |
| FCS2093 | 3" 8-Bolt Flange to 2" Lap Flange PRV Adapter | 4 ea |
| **Rack 21 Shelf 2** | | |
| FCS237 | 1850 connector | 8 ea |
| FCS693 | 1 5/8 x 1 5/8 Pre-Gal channel 5' | 5 ea |
| **Rack 21 Shelf 3** | | |
| FCS692 | Unistrut 1 5/8" X 7/8" 5' | 14 ea |
| **Rack 21 Shelf 4** | | |
| FCS635 | Angle Steel 2" x 2" x 3/16" x 5' | 7 ea |
| **Rack 21 Shelf 5** | | |
| FCS328 | Cradle Support Pipe - 5' long | 120 ft |
| FCS693 | 1 5/8 x 1 5/8 Pre-Gal channel 5' | 9 ea |
| **Rack 21 Shelf 6** | | |
| FCS1345 | 3/8" OD Black Polyethylene Tubing - 500 Ft | 500 ft |
| **Rack 21 Wall** | | |

| FCS278 | 3/8" Air Hose | 444.33333 ft |
|---|---|---|
| **Rack 3 Floor** | | |
| FCS32 | Braided Flex Hose 2" ID x 3' Long | 10 ea |
| PEAK-0122 | 2" Flanged S/S "T" | 1 ea |
| PEAK-0138 | 2" Flanged S/S 90° | 3 ea |
| **Rack 3 Hanger** | | |
| FCS42 | Braided Flex Hose 2" ID x 5' Long | 30 ea |
| PEAK-0120 | 2" Flanged S/S 90° | 4 ea |
| PEAK-0121 | 2" Flanged S/S "Y" | 7 ea |
| PEAK-0123 | Double Water Fall Head Manifold | 7 ea |
| PEAK-0124 | 2" Flanged S/S 45° | 23 ea |
| PEAK-0139 | 2" Flanged S/S 45° XL | 19 ea |
| PEAK-0151 | VJ Support Universal up to 41" | 37 ea |
| **Rack 3 Shelf 1** | | |
| PEAK-0121 | 2" Flanged S/S "Y" | 4 ea |
| PEAK-0138 | 2" Flanged S/S 90° XL | 8 ea |
| | | |
| **Rack 3 Shelf 2** | | |
| FCS3580 | 1-1/2 flange to 1-1/2 copper adapter | 2 ea |
| PEAK-0154 | Flanged SS to Copper SWT 2" | 2 ea |
| | | |
| **Rack 4 Shelf 1** | | |
| FCS1033 | Pipe BRIDGE Kit | 1 ea |
| FCS133 | Cables Ties 14" Black (pack of 100) | 12 ea |
| FCS375 | Venting is normal 29" w x 15' H .060 Magnet | 5 ea |
| | | |
| **Rack 4 Shelf 2** | | |
| FCS374 | Nitrocrete 96" x 24" .060 Magnet | 5 ea |
| PEAK-0107 | Airhose Adapter Kit | 24 ea |
| PEAK-0133 | Junction Box Kit - Tank Valves & Sensors ; 2 round j-boxes, 2 conduit bodies, flex | 18 ea |
| | | |
| **Rack 4 Shelf 3** | | |
| FCS542 | BUNA REPAIR KIT & O-RING F/DA/SR105 ACTUATOR | 50 ea |
| PEAK-0143 | Spare Hardware | 26 ea |
| PEAK-0144 | Cold Tunnel Hardware Kit | 1 ea |
| | | |
| **Rack 4 Shelf 4** | | |
| FCS478 | WFH and ILDH Plumbing Kit | 5 ea |
| FCS532 | Waterfall Head Hardware Kit | 73 ea |
| PEAK-0147 | Cradle Verticle Lift Hardware Kit | 61 ea |
| PEAK-0269 | Single NAT MAC Air Kit | 1 ea |
| | | |
| **Rack 4 Shelf 5** | | |
| FCS660 | Galvanized 8" Clevis Hanger | 1 ea |
| FCS85 | Stainless clevis hanger 5" | 93 ea |
| | | |
| **Rack 5 Floor** | | |
| FCS948 | 1/2 CounterStrike Flexible Gas Tubing 10' | 24 ea |
| | | |
| **Rack 5 Shelf 1** | | |
| PEAK-0106 | Piping Kit | 2 ea |
| | | |
| **Rack 5 Shelf 2** | | |
| FCS248 | 5 3/4"to 7-3/4" hose clamp | 69 ea |
| FCS353 | Automatic Air Drain | 15 ea |
| PEAK-0149 | Double Cold Tunnel Hardware Kit | 5 ea |
| | | |
| **Rack 5 Shelf 3** | | |
| FCS115 | 6" Unistrut Pipe Clamp (Rigid) | 61 ea |
| FCS120 | 4" Unistrut Pipe Clamp (Rigid) | 8 ea |
| FCS423 | Flat Alum 1/4" x 4" X12' | 48 ft |
| FCS615 | Unistrut Clamp 5-9/16" ID, 1/8" Thick | 73 ea |
| | | |
| **Rack 5 Shelf 4** | | |
| FCS116 | Restrictor Plates | 29 ea |
| FCS265 | Mending Plates | 76 ea |
| FCS277 | NAT box tie-down strap | 44 ea |

| PEAK-0197 | Emerson Solenoid Kit | 7 ea |
|---|---|---|

**Rack 6 Floor**

| FCS1014 | Wall anchor brackets with support | 4 ea |
| FCS767 | Trailer Tank Steps | 2 ea |

**Rack 6 Shelf 1**

| PEAK-0123 | Double Water Fall Head Manifold | 8 ea |

**Rack 6 Shelf 3**

| FCS848 | Aluminum, Single Point Load Cell 500 kg | 1 ea |
| PEAK-0120 | 2" Flanged S/S 90° | 4 ea |

**Rack 7 Floor**

| FCS1013 | 3" copper to 2" flanged adapter | 2 ea |
| FCS916 | 3" Copper "Y" Sub Assembly | 3 ea |
| PEAK-0168 | Tunnel Skirt Section Access Door  Kit 30 degrees | 3 ea |

**Rack 7 Shelf 1**

| FCS543 | 3" Coupling Insulation (8" PVC) | 16 ea |

**Rack 7 Shelf 2**

| FCS485 | 2" Pipe Insulation Coupler (6" PVC) | 10 ea |
| PEAK-0166 | Plow Kit | 1 ea |

**Rack 7 Shelf 3**

| FCS553 | 3" type L copper pipe 2' | 29 ea |
| FCS554 | 2" type L copper pipe 2' | 36 ea |
| FCS918 | 3" type L copper pipe 4-1/2" | 10 ea |
| FCS919 | 2" type L copper pipe 4-1/2" | 14 ea |
| PEAK-0155 | 3" Custom "Y" Pipe - Welded assembly | 2 ea |

**Rack 8 Floor**

| FCS384 | #15-6" PVC 90 Degree Cover | 22 ea |
| PEAK-0118 | Waterfall Head | 38 ea |
| PEAK-0158 | Cold Tunnel Side Panels 45° | 22 ea |

**Rack 8 Shelf 2**

| FCS388 | #18-8" PVC 45 Degree Cover | 42 ea |
| FCS46 | HMI enclosure | 4 ea |

**Rack 8 Shelf 3**

| FCS385 | #15-6" PVC 45 Degree Cover | 18 ea |
| FCS386 | #18-8" PVC 90 Degree Cover | 7 ea |
| FCS786 | Flat Alum 1/4" x 4" X 5' | 10 ea |
| FCS949 | Water Spray Head Sub-Assembly | 27 ea |
| FCS953 | Angle Steel 2" x 2" x 3/16" x 5' | 19 ea |
| FCS975 | Inner Cold Tunnel Panel Kit | 8 ea |
| PEAK-0158 | Cold Tunnel Side Panels 45° | 3 ea |

**Rack 9 Shelf 1**

| FCS354 | Air Dryer 4 port tanks | 4 ea |
| PEAK-0106 | Piping Kit | 33 ea |
| PEAK-0153 | Junction Box Kit - Tank & 2 NAT Boxes ;  4 round j-boxes, 2 conduit bodies, flex | 3 ea |

**Rack 9 Shelf 2**

| FCS1036 | 3" Globe Valve repair kit | 3 ea |
| FCS333 | Rubber Tape | 4 ea |
| FCS3344 | 3" Globe Valve Repair Kit - Soft Goods Kit, Version #3 (Seal, GlandPacking, Body Gasket) | 2 ea |
| FCS6 | Triac Pneumatic Ball Valve | 7 ea |
| FCS793 | Muffler, 1 1/2 In Fnpt | 6 ea |
| FCS853 | Muffler, 1 In Fnpt | 1 ea |
| FCS854 | Exhaust Rain Cap, 1-1/4 x 1-7/16 In | 5 ea |
| FCS986 | 1 1/2" Exhaust Raincap | 8 ea |

**Rack 9 Shelf 3**

| | | |
|---|---|---|
| FCS3204 | 1-1/2" Globe Valve Rebuild Kit | 5 ea |
| FCS3205 | 2" Globe Valve Rebuild Kit | 2 ea |
| FCS758 | Copper Gasket 1.5" O2 | 26 ea |
| FCS759 | Copper Gasket 2.5" O2 | 19 ea |
| FCS760 | Virgin Teflon Gasket 1.5" O2 | 28 ea |
| FCS761 | Virgin Teflon Gasket 2.5" O2 | 31 ea |
| FCS835 | Gasket, 1-1/2", Teflon | 25 ea |
| FCS839 | Piston Assembly, 1-1/2" Gas | 17 ea |
| FCS840 | Piston Assembly, 1" GAS | 1 ea |
| FCS841 | Gasket, 1", Teflon | 4 ea |
| FCS842 | Piston Assembly, 1/2" Gas | 28 ea |
| FCS843 | Gasket, 1/2"-3/4", Teflon | 60 ea |
| FCS848 | Aluminum, Single Point Load Cell 500 | 10 ea |
| FCS869 | Single sub base for valve (Emerson) | 1 ea |
| FCS928 | GASKET-25%GF TFE 4-BOLT FLNG (BG | 25 ea |

**Rack 9 Shelf 4**

| | | |
|---|---|---|
| FCS1002 | ASCO Solenoid Kit | 2 ea |
| FCS871 | Inline Air Filter 3/8 NPT | 2 ea |
| PEAK-0110 (No UL) | HMI Double Assembly | 4 ea |
| PEAK-0192 | Air Filter Kit | 16 ea |
| PEAK-0205 | NAT box V6.3 Finished Without Solenoid | 4 ea |
| SIGN-05 | Liquid Nitrogen in use above | 2 ea |

**Receiving**

| | | |
|---|---|---|
| ACS18 | Asset Controlled Stock - Vacuum Jacketed Rigid Pipe, 2"ID, 20'L | 1 ea |
| Custom-105 degree 2" flanged connector | custom 105 degree 2" flanged | 1 ea |
| FCS100 | Galvanized Perforated Tube 2" - 12' stick | 43 ft |
| FCS1000 | Fitting Insulation,90 Elbow,3 In | 15 ea |
| FCS1002 | ASCO Solenoid Kit | 3 ea |
| FCS1007 | 3" 8-Bolt Flange to Copper Adapter | 4 ea |
| FCS1008 | MAC Solenoid Valve With Base 4-Way, Single Solenoid | 1 ea |
| FCS101 | Galvanized Perforated Tube 1 3/4" - 12' stick | 44 ft |
| FCS1011 | Nitrogen fill connection | 1 ea |
| FCS1012 | Mueller Female groove flange w/stub | 1 ea |
| FCS1015 | Mueller Male tongue flange w/stub | 1 ea |
| FCS1016 | 3" Pipe Insulation 3' | 7 ea |
| FCS1050 | Inner Cold Tunnel Panel Right Hand | 3 ea |
| FCS1065 | Custom Wall Bracket 48 X 36 | 4 ea |
| FCS109 | Galvanized Threaded Rod 10' | 200 ft |
| FCS110 | 16GB SD card | 21 ea |
| FCS1232 | 4" x 1/4" x 11 1/2" Flat Bar | 10 ea |
| FCS1238 | Magnatrol Valve  1-1/2"  200 PSI | 1 ea |
| FCS124 | 2" x 4" SCH40 Type 304 stainless nipple | 3 ea |
| FCS1248 | Undersized Steel Machine Key Stock, Zinc-Plated, 1/4" x 1/4", 12" Long | 1 ea |
| FCS127 | Galvanized Sheet 2' x 4' | 17 ea |
| FCS13 | VJ Flex Hose  2" ID x 30' Long | 1 ea |
| FCS16 | VJ Flex Hose  2" ID x 20' Long | 1 ea |
| FCS18 | VJ Rigid Pipe  2" ID x 20' Long | 2 ea |
| FCS19 | VJ Flex Hose  2" ID x 5' Long | 6 ea |
| FCS193 | 1-1/2" x close brass nipple - inactive. duplicate part | 2 ea |
| FCS199 | 1-1/2" x 4" stainless nipple | 4 ea |
| FCS2077 | Water Spray Bar Mounting Bracket. | 1 ea |
| FCS2082 | 4"x 1/4" Flat steel | 5 ea |
| FCS2083 | 1" Steel Spacer Plate | 4 ea |
| FCS2089 | 1/2" Steel Spacer Plate | 8 ea |
| FCS2226 | Hose Clamps 11/16" to 1-1/4" Clamp ID | 1 ea |
| FCS2228 | Grease Gun Cartridge | 1 ea |
| FCS245 | 2" copper tee | 3 ea |
| FCS248 | 1/2" x 3" Brass Pipe Nipple | 17 ea |
| FCS253 | 5 3/4"to 7-3/4" hose clamp | 20 ea |
| FCS260 | Conduit body cover 1/2" | 36 ea |
| | DIN rail PK10 | |

| | | |
|---|---|---|
| FCS262 | NIP BRS 1/2" CL | 3 ea |
| FCS265 | Mending Plates | 6 ea |
| FCS277 | NAT box tie-down strap | 6 ea |
| FCS279 | Terminal end cap PK50 | 50 ea |
| FCS287 | 14/4 SO Cable Spool 1000' | 100 ft |
| FCS311 | Load Cell Top Plates | 2 ea |
| FCS314 | 12" x 12" Back panel | 3 ea |
| FCS326 | 2" X 4"  Aluminum nipple | 9 ea |
| FCS328 | Cradle Support Pipe - 5' long | 10 ft |
| FCS3333 | 3/4" PVC Coupling - Non inventory | 1 ea |
| FCS3334 | 3/4" PVC Plug - Non inventory | 1 ea |
| FCS334 | Flat Bar - CT Skirting 1 1/2" | 9 ea |
| FCS36 | PLC (new style) | 3 ea |
| FCS379 | Grab Handle | 1 ea |
| FCS39 | Red lion signal conditioner | 6 ea |
| FCS393 | VJ Rigid Pipe  2" ID x 10' Long | 3 ea |
| FCS397 | 3" Copper 90 Short Radius Street | 2 ea |
| FCS398 | 3" Copper Tee | 1 ea |
| FCS409 | Perforated Tubing 1-3/4" x 65" | 7 ea |
| FCS42 | Braided Flex Hose    2" ID x 5' Long | 8 ea |
| FCS442 | Perforated Square Tube, Gal Uprights | 4 ea |
| FCS452 | Cradle | 3 ea |
| FCS457 | VJ Flex Hose  3" ID x 5' Long | 2 ea |
| FCS458 | VJ Flex Hose  3" ID x 10' Long | 1 ea |
| FCS465 | 7 5/8" Unistrut Clamp | 5 ea |
| FCS472 | COLD TUNNEL END FLAP MOUNT | 12 ea |
| FCS479 | Cradle Support Pipe - 7' long | 4 ea |
| FCS48 | Analog module | 1 ea |
| FCS522 | 1/2" Rigid Locknut | 125 ea |
| FCS529 | 3/4 X 12 SCH 40 TYPE 304 SS NIPPLE | 4 ea |
| FCS54 | Ethernet switch | 8 ea |
| FCS540 | 4 AS1100-4-AS RIDGID PIPE CLAMP | 25 ea |
| FCS543 | 3" Coupling Insulation (8" PVC) | 9 ea |
| FCS544 | 2" Ball Valve Threaded , Manual Operation | 1 ea |
| FCS578 | Auxiliary Lane Leg Weldment | 4 ea |
| FCS586 | Auxiliary Lane A Frame Leg Weldment | 2 ea |
| FCS591 | Auxiliary Lane A Frame Top Weldment | 1 ea |
| FCS60 | Air solenoid valve (new style) | 10 ea |
| FCS604 | Flat Steel 1/4" X 4" X 35 3/4" | 16 ea |
| FCS605 | Angle Steel 1/8" x 1" x 1" x 15" | 16 ea |
| FCS606 | Unistrut 1 5/8" X 7/8" X 35 3/4" | 16 ea |
| FCS612 | Cond body cover gasket | 65 ea |
| FCS615 | Unistrut Clamp 5-9/16" ID, 1/8" Thick | 2 ea |
| FCS638 | 90 LNG RAD FTG ELBOW 3" Street | 2 ea |
| FCS657 | 1/2" REGO EXTENDED STEM CRYOGENIC VALVE | 12 ea |
| FCS667 | Angle Steel 2" x 2" x 3/16" x 6" | 56 ea |
| FCS673 | 3"X10" 304 Stainless Steel Nipple | 11 ea |
| FCS676 | 3" Copper Female SWT Adpt | 12 ea |
| FCS691 | 1/2 X 3 SCH 40 TYPE 304 SS NIPPLE | 1 ea |
| FCS7 | VJ Flex Hose  2" ID x 10' Long | 2 ea |
| FCS707 | In Line Mounting Rod | 38 ea |
| FCS708 | In Line Mounting Perforated Tube | 36 ea |
| FCS712 | Headpiece, 2-1/2" Nut x 2" MNPT, 304SS | 2 ea |
| FCS73 | 2" stainless flange threaded | 3 ea |
| FCS730 | 90 degree aluminum conduit body 1/2 NPSM | 13 ea |
| FCS74 | 2" stainless flange weldable | 13 ea |
| FCS755 | 3X12 304 SS NIPPLE | 2 ea |
| FCS758 | Copper Gasket 1.5" O2 | 1 ea |
| FCS770 | Riser Tube Assembly (Candy cane) | 6 ea |
| FCS777 | Oxygen Depletion Safety Alarm | 8 ea |
| FCS778 | 1-1/2 BRASS NIPPLE Close | 7 ea |
| FCS8 | VJ Flex Hose  2" ID x 15' Long | 1 ea |
| FCS838 | Load Cell Top Plates screw | 10 ea |
| FCS839 | Piston Assembly, 1-1/2" Gas | 1 ea |
| FCS842 | Piston Assembly, 1/2" Gas | 3 ea |
| FCS844 | Bolt 1/2"-13 X 1-1/2" Long | 3 ea |

| | | |
|---|---|---|
| FCS851 | 2 X 1 304 SS BUSHING | 1 ea |
| FCS890 | Inner Cold tunnel 6" Bent Sheet | 4 ea |
| FCS891 | Inner Cold Tunnel Plate with Holes | 4 ea |
| FCS938 | 3" Stainless Steel TEE butt weld | 1 ea |
| FCS944 | Sprinkler Head - 15 van with adapter | 8 ea |
| FCS952 | 3" SS BW 90 degree LR | 1 ea |
| FCS958 | 15K Load Cell | 5 ea |
| FCS960 | Cord Grip 1/2" .375-.500 | 17 ea |
| FCS996 | Trailer Tank Ramps | 2 ea |
| FCS997 | Tank Manifold Copper 3" with gauge and PRV | 1 ea |
| PEAK-0108 | Spare Parts Kit | 3 ea |
| PEAK-0110 (No UL) | HMI Double Assembly | 1 ea |
| PEAK-0112 | NAT Box Finished V6 | 2 ea |
| PEAK-0120 | 2" Flanged S/S 90° | 2 ea |
| PEAK-0124 | 2" Flanged S/S 45° | 2 ea |
| PEAK-0125 | Auxilary Lane | 1 ea |
| PEAK-0131 | Air Dryer Kit - INACTIVE | 1 ea |
| PEAK-0134 | Inline Dispensing Head - 5' | 12 ea |
| PEAK-0135 | Inline Dispensing Head Mounting Kit | 2 ea |
| PEAK-0138 | 2" Flanged S/S 90° XL | 1 ea |
| PEAK-0143 | Spare Hardware | 19 ea |
| PEAK-0145 | Cold Tunnel Side Panel 45° with Access Door | 17 ea |
| PEAK-0146 | Rack Hardware Kit | 1 ea |
| PEAK-0151 | VJ Support Universal up to 41" | 14 ea |
| PEAK-0153 | Junction Box Kit - Tank & 2 NAT Boxes ;  4 round j-boxes, 2 conduit bodies, flex | 2 ea |
| PEAK-0158 | Cold Tunnel Side Panels 45° | 4 ea |
| PEAK-0164 | Rack and Cold Tunnel Frame Kit | 3 ea |
| PEAK-0167 | Cold Tunnel Side Skirts 30 degree | 2 ea |
| PEAK-0168 | Tunnel Skirt Section Access Door  Kit 30 degrees | 1 ea |
| PEAK-0171 | Tank Manifold 2" Copper with PRV, Gauge and Drain | 1 ea |
| PEAK-0172 | Inline Dispensing Head - 4' | 2 ea |
| PEAK-0175 | King Pin Stand | 1 ea |
| PEAK-0176 | Load Cell Enclosure | 1 ea |
| PEAK-0178 | Air Dryer Junction Box | 9 ea |
| PEAK-0184 | PRV 2" Flanged ; with Drain & Gauge | 5 ea |
| PEAK-0190 | Aux Lane Time and Stand | 1 ea |
| PEAK-0193 | FLCD Set Up | 1 ea |
| PEAK-0195 | 2" Tank Manifold PRV Flange no drain | 4 ea |
| PEAK-0198 | NAT Box V6-2 Plumbing | 1 ea |
| PEAK-0199 | Finished NAT box V6-2 | 1 ea |
| PEAK-0201 | Antenna Extension for Super Antenna 20' | 10 ea |
| PEAK-0205 | NAT box V6.3 Finished Without Solenoid | 2 ea |
| PEAK-0268 | Belt Load Cell System | 1 ea |
| PEAK-0269 | Single NAT MAC Air Kit | 3 ea |
| **Saw Drop** | | |
| FCS319 | 2" Straight SS Pipe 21' | 3 ft |
| FCS414 | 3" Stainless Steel Pipe | 13 ft |
| FCS425 | Angle Alum 3/16" x 2" x 2" | 4 ft |
| FCS433 | 3"  type L  copper pipe | 24.25 ft |
| FCS437 | Flat Steel 1/4" x 5" X 20' | 28 ft |
| FCS447 | 2"  type L  copper pipe | 175 in |
| FCS725 | Angle Steele 5 X 3 X 1/4 X 20' | 5 ft |
| FCS797 | 2" x 3" x 1/4" x 24' Aluminum Angle | 5 ft |
| FCS808 | 2" x 2" x 1/8" x 5' Aluminum C-Channel | 9 ft |
| FCS81 | 4" Type L Copper pipe | 11 ft |
| PEAK-0110 (No UL) | HMI Double Assembly | 6 ea |
| FCS2040 | 3/8 brass NPTF Male to Male | 16 ea |
| FCS2041 | 1/2 Flare X 1/4 Female Brass Adapter | 10 ea |
| FCS2042 | 1/2 Pipe Thread Flair Nut for Tubing | 30 ea |
| FCS2043 | 3/8 Pipe Thread Flair Nut for Tubing | 22 ea |

| | | |
|---|---|---|
| FCS225 | 3/4" to 1/2" M-M Flare | 10 ea |
| FCS242 | 3/8" x 1/2" Double Barb | 50 ea |
| FCS273 | 3/8" x 1/4" Double Barb | 50 ea |
| FCS274 | 3/8" x 1/4" Hose x MIP Brass hose barb 90 | 80 ea |
| FCS804 | Bushing, 5/8"X3/8"X1/2" Oil Embedded | 14 ea |
| FCS805 | Clevis Pin, Stainless Steel 3/8"X2-1/8" PK5 | 4 ea |
| FCS806 | End Cuff Round Bellows 1' Extended X 3/4" | 2 ea |
| FCS807 | Spacer, Aluminum ¾" X 3/8" X 1/2" | 10 ea |
| FCS810 | Nipple, Brass 1/8" X 4" | 22 ea |
| FCS811 | Brass Elbow 90, 1/8 NPTF Female x Male | 99 ea |
| FCS812 | Brass Elbow 90, 1/8 NPT Female | 43 ea |
| FCS813 | Nipple, Brass 1/8" NPT X 5" | 22 ea |
| FCS814 | Nipple, Brass 1/8" NPT X 1-1/2" | 130 ea |
| FCS815 | Nipple, Brass 1/8" NPT X 2-1/2" | 23 ea |
| FCS816 | Nipple, Brass 1/8" NPT X 6" | 23 ea |
| FCS817 | Hose Fitting Barbed 3/8 X 1/8 NPTF Female PK5 | 110 ea |
| FCS832 | Loop Clamp 1/2" ID PK25 | 74 ea |
| FCS877 | Stainless Steel U-Bracket | 10 ea |
| FCS879 | Washer 13/16 ID 1-1/2 OD | 39 ea |
| FCS954 | Aluminum Unthreaded Spacer 3/4 OD 1/4 Long | 13 ea |
| FCS955 | Aluminum Spacer 3/4 X 3/4 X 3/8 | 4 ea |
| FCS956 | Aluminum Spacer 3/4 X 1/8 X 3/8 | 11 ea |
| FCS957 | Oil-Embedded Flanged Sleeve Bearing 5/16 X 7/16 X 1/2 | 6 ea |

**Stock**

| | | |
|---|---|---|
| FCS1070 | Belt Load Cell Roller C5 20" | 11 ea |
| FCS119 | HMI back plate 13" x 13" | 3 ea |
| FCS2077 | Water Spray Bar Mounting Bracket. 4"x 1/4" Flat steel | 1 ea |
| FCS2084 | Hardware Kit for Load Cell Assembly | 2 ea |
| FCS2088 | 7/8" ID U-Bolts, 1/4" - 20 Thread size | 2 ea |
| FCS2089 | Hose Clamps 11/16" to 1-1/4" Clamp ID | 4 ea |
| FCS240 | 5050 connector | 1 ea |
| FCS2456 | NIT250 Bronze Nut | 2 ea |
| FCS2457 | NIT250 Headpiece Threaded | 6 ea |
| FCS26 | Touch Screen | 1 ea |
| FCS3335 | Gauge 4" Dial, 0-300PSIG, Low Mount 1/4" MNPT, Glycerin Filled | 1 ea |
| FCS3336 | Tongue Mueller Flange:1-1/2" | 1 ea |
| FCS336 | DIGI - WR11 | 41 ea |
| FCS403 | 2" Stainless Lap Flange | 1 ea |
| FCS653 | HMI Back Plate Assembly | 1 ea |
| FCS676 | 3" Copper Female SWT Adpt | 1 ea |
| FCS859 | Unistrut 1 5/8" X 7/8" 20" | 140 ea |
| FCS949 | Water Spray Head Sub-Assembly | 1 ea |
| PEAK-0110 (No UL) | HMI Double Assembly | 1 ea |
| PEAK-0152 | NAT Box Manifold V6 | 4 ea |
| PEAK-0154 | Flanged SS to Copper SWT 2" | 25 ea |
| PEAK-0187 | Water Spray Bar Install Kit | 1 ea |
| PEAK-0269 | Single NAT MAC Air Kit | 9 ea |

**Tank Parts Shelf 1**

| | | |
|---|---|---|
| FCS151 | Red Masterlock Blade Covers | 8 ea |
| FCS1511 | Electrical plug lockout - 110 & 220 Volt | 10 ea |
| FCS2110 | type K Soft Coil, Water 3/8in. x 60ft, Copper Line | 54 ft |
| FCS3120 | Tank guage - inches level | 1 ea |
| FCS3206 | NC164 NIT150 to NIT250 Thread | 3 ea |

**Tank Parts Shelf 2**

| | | |
|---|---|---|
| FCS2069 | RB- OrfcPlt_1" 4 Bolt 304 SS O2 CLND | 4 ea |
| FCS2111 | RC_Head_Head SFTY 1.5" 127psi NKL-DISC UNESTRICTED USE | 4 ea |
| FCS2200 | 1/4" NPT DOT 1/2" OD Brass Fitting | 5 ea |

| | | |
|---|---|---|
| FCS2220 | 1/2"-13 x 2-1/2" ASTM F593 18-8 Stainless Steel Hex Cap Screw | 20 ea |

**Tank Parts Shelf 3**

| | | |
|---|---|---|
| FCS2109 | DA_KIT_KIT Bolting, Flange SPLS (Mueller w/ Orifice Plate) | 4 ea |
| FCS2112 | 1 1/2 in x 18 in 316 Stainless Steel Pipe, Pipe Schedule 40, Threaded on Both Ends | 3 ea |
| FCS2113 | Standard-Wall 304/304L Stainless Steel Pipe Nipple, Threaded on Both Ends, 1-1/2 NPT, 6" Long | 3 ea |
| FCS2302 | Strut-Mount Vibration-Damping Routing Clamp with TPE Rubber Cushion, Zinc-Plated Steel, 1-5/8" ID | 1 ea |
| FCS2333 | 304 Stainless Steel Threaded Pipe Fitting 1-1/2 NPT Female | 1 ea |
| FCS2334 | 304 Stainless Steel Threaded Pipe Fitting 1 NPT Female | 2 ea |
| FCS3341 | Solder-Connect Fitting for Copper Tubing, Long Elbow Connector, Female Socket, 1-1/2 Copper Tube Size | 2 ea |

**Tank Parts Shelf 4**

| | | |
|---|---|---|
| FCS2110 | type K Soft Coil, Water 3/8in. x 60ft, Copper Line | 120 ft |
| FCS2301 | NFPA Sticker | 2 ea |
| FCS3039 | Herose Safety Valve, 1 1/2" inlet, 2" Outlet, 90 PSI | 3 ea |
| FCS3337 | HM PIAC VNL NON-FLAM GAS 2 1977 | 63 ea |
| FCS3338 | NFPA DIGIT 0 CLR VNL 4.25x4.25 | 60 ea |
| FCS3339 | NFPA HAZCOM LBL VNL 10" | 20 ea |
| FCS3340 | NFPA DIGIT 3 CLR VNL 4.25 x 4.25 | 30 ea |
| FCS3342 | NFPA Sticker- Nitrogen | 10 ea |

**TechniFab Offsite**

| | | |
|---|---|---|
| FCS13 | VJ Flex Hose  2" ID x 30' Long | 3 ea |
| FCS16 | VJ Flex Hose  2" ID x 20' Long | 2 ea |
| FCS19 | VJ Flex Hose  2" ID x 5' Long | 3 ea |
| FCS393 | VJ Rigid Pipe  2" ID x 10' Long | 7 ea |
| FCS457 | VJ Flex Hose  3" ID x 5' Long | 4 ea |
| FCS458 | VJ Flex Hose  3" ID x 10' Long | 2 ea |
| FCS459 | VJ Flex Hose  3" ID x 15' Long | 8 ea |

**Transit**

| | | |
|---|---|---|
| FCS100 | Galvanized Perforated Tube 2" - 12' stick | 1 ft |

**VJ Crate #1**

| | | |
|---|---|---|
| FCS457 | VJ Flex Hose 3" ID x 5' Long | 1 ea |

**VJ Room Hanger**

| | | |
|---|---|---|
| FCS457 | VJ Flex Hose 3" ID x 5' Long | 4 ea |

**VJ Room Rack 1**

| | | |
|---|---|---|
| FCS19 | VJ Flex Hose 2" ID x 5' Long | 6 ea |

**VJ Room Rack 1**

| | | |
|---|---|---|
| FCS7 | VJ Flex Hose 2" ID x 10' Long | 5 ea |

**VJ Room Rack 1**

| | | |
|---|---|---|
| FCS7 | VJ Flex Hose 2" ID x 10' Long | 14 ea |

**VJ Room Rack 2**

| | | |
|---|---|---|
| FCS16 | VJ Flex Hose 2" ID x 20' Long | 14 ea |

**VJ Room Rack 2**

| | | |
|---|---|---|
| FCS8 | VJ Flex Hose 2" ID x 15' Long | 12 ea |

**VJ Room Rack 2**

| | | |
|---|---|---|
| FCS8 | VJ Flex Hose 2" ID x 15' Long | 12 ea |

**Weld Staging Area**

| | | |
|---|---|---|
| FCS377 | Tunnel Skirt Section Access 45 degrees | 1 ea |
| FCS378 | Access Door | 7 ea |
| FCS487 | Tunnel Skirt Section with Door 30 degrees | 2 ea |

**WIP**

| | | |
|---|---|---|
| FCS667 | Angle Steel 2" x 2" x 3/16" x 6" | 5 ea |
| FCS669 | 2"X10" 304 Stainless Steel Nipple | 5 ea |
| FCS991 | Polyurethane-Tread Wheels | 1 ea |
| PEAK-0206 | Aluminum Cradle | 1 ea |

**Yellow Rack 1 Shelf**

| | | |
|---|---|---|
| FCS292 | Bolt 3/8" x 1-1/2" | 110 ea |
| FCS505 | Solenoid-Directional Control-Plow Kit | 15 ea |
| FCS58 | Air solenoid valve (old style) | 6 ea |
| FCS738 | MAC Valve Solenoid 5.4 Watts 120 PSI | 2 ea |
| FCS845 | 1/2" Magnatrol Valve | 9 ea |
| FCS846 | Magnatrol Valve 1" max PSI 300 (Gas) | 10 ea |
| FCS889 | 3/8" hose 6" | 90 ea |
| FCS995 | Solenoid Air Kit | 2 ea |
| PEAK-0199 | Finished NAT box V6-2 | 1 ea |

**Yellow Rack 1 Shelf**

| | | |
|---|---|---|
| FCS157 | FloTite Valve Handle | 87 ea |
| FCS2229 | Magnatrol Valve 1" Bronze NEMA 4 | 5 ea |
| FCS379 | Grab Handle | 7 ea |
| FCS60 | Air solenoid valve (new style) | 22 ea |
| FCS695 | Air Cylinder 1-1/2" Bore 8" Stroke 90 degree ports | 7 ea |
| FCS770 | Riser Tube Assembly (Candy cane) | 3 ea |
| FCS873 | LOX-8 Squeeze Pouch | 246 ea |

**Yellow Rack 1 Shelf**

| | | |
|---|---|---|
| FCS1238 | Magnatrol Valve  1-1/2"  200 PSI | 2 ea |
| FCS2078 | Spray Bar Solenoid Mounting Bracket. 1/8" Steel Flat bent | 75 ea |

**Yellow Rack 2**

| | | |
|---|---|---|
| FCS22 | Phase Separator - Current | 17 ea |

**Yellow Rack 2**

| | | |
|---|---|---|
| FCS2060 | 12" 47 Degree Plow Head 47UW12B7 | 2 ea |
| FCS2061 | 4" Plow Head 3 Point Sweep G4B | 5 ea |
| FCS2062 | 4" 2 Bolt Plow Head Duckfoot Sweep KD400F | 7 ea |
| FCS2063 | 7" Plow Head 3 Point Sweep G7B | 5 ea |
| FCS2064 | 9" Plow Head 3 Point Sweep G9B | 5 ea |
| FCS284 | 1/2" bonding locknut | 187 ea |
| FCS372 | " N" 5" x 5" Hexgon  Shaped Dte cut Decal | 118 ea |
| FCS373 | Venting is normal 4" w x 2' H | 60 ea |
| FCS410 | Perforated Tubing 1-3/4" x 44" | 38 ea |
| FCS537 | 1/4" 100 PSI Dewar Safety Pressure | 10 ea |
| FCS559 | Relief Valve Connector HTP Din 43650 11mm, 1/2" | 13 ea |
| FCS712 | NPT Headpiece, 2-1/2" Nut x 2" MNPT, 304SS | 3 ea |
| FCS747 | ADAPTER-NIT 2.5"HE X 1.5"FE | 2 ea |
| FCS870 | SOLENIOD PLATE 5/2 | 19 ea |

**Yellow Rack 2**

| | | |
|---|---|---|
| FCS142 | 160 PSI 3-1/2" brass gauge | 11 ea |
| FCS197 | 3/4" Stainless 'T' | 4 ea |
| FCS2059 | 6" 47 Degree 1-3/4 Shank Plow Head 47UW6B7 | 1 ea |
| FCS229 | 2" yellow gasket | 18 ea |
| FCS440 | Latches CT/NAT | 32 ea |
| FCS544 | 2" Ball Valve Threaded , Manual Operation | 6 ea |
| FCS549 | PERFORATED TUBE 2"X2" 48" | 10 ea |
| FCS563 | 3/4 X 1/4 150# TYPE 304 SS BUSHING | 6 ea |
| FCS824 | S-Tine, Heavy Duty 14-12" Clearance | 3 ea |
| FCS825 | 9" X ¼" 47 degree Plow Head | 7 ea |

| | | |
|---|---|---|
| FCS826 | 6" X ¼" 47 degree Plow Head | 5 ea |
| FCS827 | 12" X ¼" 54 degree Plow Head | 6 ea |
| FCS828 | 8" X 3/16" 54 degree Plow Head | 1 ea |
| FCS876 | REGO RELIEF VALVE, 3/4" INLET X 1" OUTLET, 100PSI | 9 ea |

**Yellow Rack 2**

| | | |
|---|---|---|
| FCS4 | 2" Ball Valve Flanged , Manual Operation | 2 ea |
| FCS409 | Perforated Tubing 1-3/4" x 65" | 9 ea |

**Yellow Rack 3 Shelf**

| | | |
|---|---|---|
| FCS338 | 1/2" Weldable nuts | 162 ea |
| FCS477 | Rivets 3/16" | 1,334 ea |

**Yellow Rack 3 Shelf**

| | | |
|---|---|---|
| FCS129 | 2" brass coupler F-F | 3 ea |
| FCS298 | 5/8" Stainless Steel Washer | 1,843 ea |
| FCS305 | Washers Zinc 1/2" Lock | 2,545 ea |
| FCS367 | 1/2" Stover nuts | 586 ea |
| FCS464 | 5/16" Nut Zinc | 4,345 ea |
| FCS658 | 3/8 Nut G5 Zinc Zinc Plated | 1,021 ea |

**Yellow Rack 3 Shelf**

| | | |
|---|---|---|
| FCS283 | Bolt 3/8" x 4-1/2" | 1,250 ea |
| FCS819 | Bolt 3/8 X 7 | 296 ea |
| FCS820 | Bolt 3/8 X 3-1/2 | 296 ea |
| FCS821 | Bolt 3/8 X 5 | 211 ea |
| FCS822 | Bolt 3/8 X 3 | 318 ea |

**Yellow Rack 3 Shelf**

| | | |
|---|---|---|
| FCS289 | Bolt 3/8" x 2-3/4" | 264 ea |
| FCS297 | 3/8" Stover Nut | 2,748 ea |
| FCS309 | Washers Zinc 3/8" Flat | 19,224 ea |
| FCS463 | 3/8" Heavy Hex Nut | 423 ea |

**Yellow Rack 4 Shelf**

| | | |
|---|---|---|
| FCS2129 | Standard-Wall 304/304L Stainless Steel Pipe, Threaded on Both Ends, 1-1/2 Pipe Size, 48" Long | 3 ea |

**Yellow Rack 4 Shelf**

| | | |
|---|---|---|
| FCS2118 | 1" SS 6" Nipple1 in x 6 in 304 Stainless Steel Nipple, Pipe Schedule 40, Threaded on Both Ends | 2 ea |
| FCS2221 | 1/2"-13 18-8 Stainless Steel Finished Hex Nut | 30 ea |

**Yellow Rack 4 Shelf**

| | | |
|---|---|---|
| FCS2086 | Barbed ½" Brass Hose Fittings | 11 ea |
| FCS2108 | 1 1/2" Mueller Gasket | 10 ea |
| FCS2302 | Strut-Mount Vibration-Damping Routing Clamp with TPE Rubber Cushion, | 8 ea |
| FCS2304 | Zinc-Plated Steel, 1-5/8" ID | 3 ea |
| FCS2305 | Placard System - Flammable 2, Non-Flammable 2, Oxygen 2, Blank | 1 ea |
| FCS535 | Nitrogen Hose Nut NI-150 Bronze Pipe-Away Adapter 1/4" NPT | 4 ea |

**Zzaq's Desk**

| | | |
|---|---|---|
| FCS111 | Solid state relay | 2 ea |
| FCS20 | Rosemount Sensor | 2 ea |

**Fort Collins R&D**

**Indoor Rack 1shelf**

| | | |
|---|---|---|
| FCS927 | INLINE CRYOVENT | 2 ea |

**Indoor Rack 2 Shelf**

| | | |
|---|---|---|
| FCS3 | Phase separator (new style) | 1 ea |
| FCS690 | Air Cylinder, Double-Acting 1-1/2" bore 8" stroke | 2 ea |

**Indoor Rack 2 shelf**

| | | |
|---|---|---|
| FCS5 | Flow Tite Pneumatic Ball Valve | 3 ea |

**Indoor Rack 2 shelf**

| | | |
|---|---|---|
| FCS845 | 1/2" Magnatrol Valve (Gas) | 2 ea |

**Outside Behind**

| | | |
|---|---|---|
| FCS18 | VJ Rigid Pipe  2" ID x 20' Long | 1 ea |
| FCS2231 | Mounting Foot for Perf tube | 8 ea |

**Outside System**

| | | |
|---|---|---|
| FCS16 | VJ Flex Hose  2" ID x 20' Long | 1 ea |
| FCS18 | VJ Rigid Pipe  2" ID x 20' Long | 1 ea |
| FCS20 | Rosemount Sensor | 2 ea |
| FCS22 | Phase Separator - Current | 2 ea |
| FCS2232 | 2" Square Tube Cross Clamp | 2 ea |
| FCS32 | Braided Flex Hose  2" ID x 3' Long | 2 ea |
| FCS392 | VJ Rigid Pipe  2" ID x 15' Long | 1 ea |
| FCS42 | Braided Flex Hose    2" ID x 5' Long | 5 ea |
| FCS457 | VJ Flex Hose  3" ID x 5' Long | 1 ea |
| FCS5 | Flow Tite Pneumatic Ball Valve | 4 ea |
| FCS767 | Trailer Tank Steps | 1 ea |
| FCS846 | Magnatrol Valve 1" max PSI 300 (Gas) | 1 ea |
| PEAK-0112 | NAT Box Finished V6 | 2 ea |
| PEAK-0124 | 2" Flanged S/S 45° | 1 ea |
| PEAK-0125 | Auxilary Lane | 1 ea |
| PEAK-0134 | Inline Dispensing Head - 5' | 1 ea |
| PEAK-0135 | Inline Dispensing Head Mounting Kit | 5 ea |
| PEAK-0138 | 2" Flanged S/S 90° XL | 1 ea |
| PEAK-0164 | Rack and Cold Tunnel Frame Kit | 3 ea |
| PEAK-0172 | Inline Dispensing Head - 4' | 1 ea |
| PEAK-0184 | PRV 2" Flanged ; with Drain & Gauge | 2 ea |
| PEAK-0198 | NAT Box V6-2 Plumbing | 1 ea |

**Outside Table**

| | | |
|---|---|---|
| FCS5 | Flow Tite Pneumatic Ball Valve | 1 ea |
| PEAK-0112 | NAT Box Finished V6 | 1 ea |

**R&D indoor test**

| | | |
|---|---|---|
| FCS19 | VJ Flex Hose  2" ID x 5' Long | 1 ea |
| FCS237 | 1850 connector | 45 ea |
| FCS291 | Cable, Communication 22/4, Shielded - 1000ft | 1,000 ft |
| FCS313 | 12" x 12" Electrical Enclosure | 3 ea |
| FCS5 | Flow Tite Pneumatic Ball Valve | 1 ea |
| FCS678 | Gate Valve Lockout - 1"-3" | 5 ea |

**R&D outside rack 2**

| | | |
|---|---|---|
| FCS13 | VJ Flex Hose  2" ID x 30' Long | 1 ea |

**R&D outside rack 2**

| | | |
|---|---|---|
| FCS2188 | Female Socket-Connect, 1-1/2 Tube Size x 2 NPT Female | 2 ea |

**R&D outside rack 2**

| | | |
|---|---|---|
| FCS42 | Braided Flex Hose 2" ID x 5' Long | 5 ea |
| FCS458 | VJ Flex Hose  3" ID x 10' Long | 1 ea |
| FCS8 | VJ Flex Hose  2" ID x 15' Long | 1 ea |

**R&D outside shelf 1**

| | | |
|---|---|---|
| FCS16 | VJ Flex Hose  2" ID x 20' Long | 1 ea |

**R&D outside shelf 1**

| | | |
|---|---|---|
| PEAK-0118 | Waterfall Head | 5 ea |
| PEAK-0120 | 2" Flanged S/S 90° | 1 ea |
| PEAK-0121 | 2" Flanged S/S "Y" | 4 ea |
| PEAK-0124 | 2" Flanged S/S 45° | 3 ea |
| PEAK-0138 | 2" Flanged S/S 90° XL | 2 ea |

**R&D outside shelf 1**

| | | |
|---|---|---|
| PEAK-0134 | Inline Dispensing Head - 5' | 2 ea |

**R&D test**

| FCS133 | Cables Ties 14" Black (pack of 100) | 2 ea |
|---|---|---|
| FCS149 | Nashua Aluminum Tape | 1 ea |
| FCS237 | 1850 connector | 4 ea |
| FCS240 | 5050 connector | 1 ea |
| FCS314 | 12" x 12" Back panel | 3 ea |
| FCS3500 | 15A Industrial Grade Straight Blade Plug, Black/White; NEMA Configuration: 5-15P | 3 ea |
| FCS522 | 1/2" Rigid Locknut | 4 ea |
| FCS571 | Steel flat 1/2" X 4" X 20' | 2 ft |
| PEAK-0110 (No UL) | HMI Double Assembly | 1 ea |

**R&D work counter**

| FCS237 | 1850 connector | 1 ea |
|---|---|---|
| FCS26 | Touch Screen | 1 ea |
| FCS36 | PLC (new style) | 1 ea |

**Receiving**

| FCS1008 | MAC Solenoid Valve With Base 4-Way, Single Solenoid | 1 ea |
|---|---|---|
| FCS283 | Bolt 3/8" x 4-1/2" | 6 ea |
| FCS289 | Bolt 3/8" x 2-3/4" | 6 ea |
| FCS367 | 1/2" Stover nuts | 8 ea |
| FCS408 | 2" SWT Male Adapter | 1 ea |
| FCS421 | 3" X 2" Reducing Coupler - Male | 2 ea |
| FCS450 | 2" SWT 90 copper SR street | 2 ea |
| FCS463 | 3/8" Heavy Hex Nut | 4 ea |
| FCS49 | Limit whisker switch | 2 ea |
| FCS553 | 3" type L copper pipe 2' | 1 ea |
| FCS600 | 2" SWT FEM ADPT 603 WC402 | 4 ea |
| FCS646 | 3X3X2" Copper SWT TEE | 5 ea |
| FCS658 | 3/8 Nut G5 Zinc Zinc Plated | 20 ea |
| FCS691 | 1/2 X 3 SCH 40 TYPE 304 SS NIPPLE | 1 ea |
| FCS73 | 2" stainless flange threaded | 3 ea |
| FCS756 | 2 TYPE 304SS BLIND FLANGE | 1 ea |
| FCS819 | Bolt 3/8 X 7 | 4 ea |
| FCS820 | Bolt 3/8 X 3-1/2 | 6 ea |
| FCS821 | Bolt 3/8 X 5 | 6 ea |
| FCS822 | Bolt 3/8 X 3 | 6 ea |
| FCS846 | Magnatrol Valve 1" max PSI 300 (Gas) | 1 ea |
| PEAK-0268 | Belt Load Cell System | 1 ea |

**Stock**

| FCS20 | Rosemount Sensor | 1 ea |
|---|---|---|
| FCS230 | 3/8" x 3/8" Hose x MIP Brass hose | 1 ea |
| FCS24 | Magnatrol Valve 1-1/2" 300PSI (Liquid) | 2 ea |
| FCS261 | 3/8" Barbed Brass 'T' | 3 ea |
| FCS276 | Hose Clamps | 142 ea |
| FCS278 | 3/8" Air Hose | 150 ft |
| FCS3 | Phase separator (new style) | 1 ea |
| FCS392 | VJ Rigid Pipe  2" ID x 15' Long | 1 ea |
| FCS441 | RL1620 LOad Cells | 1 ea |
| FCS5 | Flow Tite Pneumatic Ball Valve | 1 ea |
| FCS68 | 3/8" ball valve | 1 ea |
| PEAK-0138 | 2" Flanged S/S 90° XL | 1 ea |
| PEAK-0194 | In Line Blaster Head | 4 ea |

**HMI Room**

**HMI Rack 1 Shelf 1**

| PEAK-0110 (No UL) | HMI Double Assembly | 2 ea |
|---|---|---|

**HMI Rack 2 Shelf 2**

| FCS102 | Round junction enclosure | 6 ea |
|---|---|---|
| FCS240 | 5050 connector | 14 ea |

**HMI Rack 4 Shelf 1**

| FCS719 | Enclosure 24X24X12 | 1 ea |
|---|---|---|
| FCS729 | Enclosure 20 X 20 X 12 | 2 ea |

**HMI Rack 4 Shelf 2**

| FCS762 | Enclosure 8" X 6" X 4" | 10 ea |
|---|---|---|

**HMI Rack 4 Shelf 3**

| FCS313 | 12" x 12" Electrical Enclosure | 5 ea |
|---|---|---|
| FCS791 | Enclosure 8 X 8 X 6 | 1 ea |

**HMI Rack 4 Shelf 4**

| PEAK-0188 | Plow Junction Box Assembly | 2 ea |
|---|---|---|
| **HMI Rack 5 Shelf 1** | | |
| FCS718 | Enclosure 20X20X10 | 2 ea |
| FCS968 | Enclosure 24 X 30 X 10 | 1 ea |
| FCS969 | Back Panel 30P24 | 2 ea |
| FCS970 | Enclosure 24 X 24 X 10 | 1 ea |
| FCS971 | Back Panel 24P24 | 1 ea |
| **HMI Rack 5 Shelf 2** | | |
| FCS102 | Round junction enclosure | 1 ea |
| FCS2044 | 6 X 6 Junction Box | 6 ea |
| **HMI Rack 5 Shelf 3** | | |
| FCS178 | Seal Tite Connector | 180 ea |
| FCS286 | Plastic protective bushing | 260 ea |
| FCS886 | Electrical Cord Grip 1/2 alum | 100 ea |
| **HMI Rack 5 Shelf 4** | | |
| FCS119 | HMI back plate 13" x 13" | 1 ea |
| **HMI Workbench** | | |
| FCS639 | Digital Output Module | 1 ea |
| **Receiving** | | |
| FCS1079 | 3/4" Threaded Rod 10' | 1 ea |
| FCS1088 | 3/4"-10 Hex Nut | 12 ea |
| | | |
| **WIP** | | |
| FCS230 | 3/8" x 3/8" Hose x MIP Brass hose | 8 ea |
| FCS291 | Cable, Communication 22/4, Shielded | 1,154 ft |
| PEAK-0118 | Waterfall Head | 5 ea |

**Inventory includes additional miscellaneous parts and supplies inventory at following locations:**

Dallas Storage
Atlanta Truck
Pasadena Storage
Phoenix Storage
Regional Truck
Regional Truck
RSP Atlanta
RSP Bridgeview
RSP Corpus North
RSP Davenport
RSP Maspeth
RSP Midtown
RSP North
RSP Round Rock
RSP Spy Hill
RSP W Jefferson
RSP Waltham
RSP Wilson
RSP Dallas Storage
RSP Fort Totten
RSP Pasadena
RSP Phoenix
Truck 1
Truck 2
Truck 3
Truck 4
UI 43rd Ave
UI 7th Street
UI Atlanta (Thomas)
UI Burnco
UI Cemex Dos Bocas
UI Cemex Santan
UI Coolidge
UI Doraville
UI Everett
UI Fort Totten
UI Glenwood
UI Harry Nice
UI Maspeth
UI Micron
UI Midtown
UI Mt Clemens

UI Nicholas Lees
UI North Vancouver
UI Plant 1
UI Plant 6
UI Powdersville
UI Seat Pleasant
UI Spy Hill
UI Waldorf
UI Waltham
UI Wilson

Note: HQ location headings no longer relevant due to move.

**Schedule 2.1(g)**
**Accounts Receivable as of 12/28/21**

|  | | Total |
|---|---|---|
| **Alamo Concrete** | | 0.00 |
| Corpus North | | -2,800.00 |
| **Total Alamo Concrete** | -$ | **2,800.00** |
| **Ames Construction, Inc** | | 0.00 |
| Warren AFB | | 840.00 |
| **Total Ames Construction, Inc** | $ | **840.00** |
| **Anderson Concrete** | | 0.00 |
| Plant 6 | | -2,580.00 |
| **Total Anderson Concrete** | -$ | **2,580.00** |
| **Argos** | | 0.00 |
| Bayport | | 13,175.70 |
| Berlin Road | | -4,919.05 |
| Holmes Road | | 12,772.40 |
| Red Oak | | -14,800.00 |
| Saginaw | | -12,516.20 |
| **Total Argos** | -$ | **6,287.15** |
| **Arizona Materials, L.L.C.** | | 0.00 |
| 43rd Ave (Plant 1) | | 460.00 |
| **Total Arizona Materials, L.L.C.** | $ | **460.00** |
| **CC Ready Mix** | | 0.00 |
| Flato | | -12,834.42 |
| **Total CC Ready Mix** | -$ | **12,834.42** |
| **Cemex** | | -29.91 |
| 19th Ave-Dry | | -7,464.97 |
| 19th Ave-Wet | | -1,298.00 |
| 7th Street | | -2,747.25 |
| Alpharetta - Cemex | | 276.37 |
| Cemex - Portable 1 | | -13,225.50 |
| Cemex West | | 20,781.00 |
| Coolidge | | -258.50 |
| Downtown - Cemex | | 20,063.77 |
| Higley | | 49.50 |
| Losee Wet | | 12,874.23 |
| Maricopa | | 11,871.75 |
| Midtown - Cemex | | 21,357.38 |
| San Tan | | 2,758.25 |
| Sloan | | 10,555.75 |
| Sun City | | 8.25 |
| **Total Cemex** | $ | **75,572.12** |
| **Chaney Enterprises** | | 0.00 |
| Harry Nice Bridge | | 15,260.90 |
| **Total Chaney Enterprises** | $ | **15,260.90** |
| **Lafarge** | | 0.00 |

| | | |
|---|---|---|
| Fort Totten Dry | | -0.46 |
| Golden Pass LNG 1 | | 31,520.00 |
| Manassas | | 947.02 |
| **Total Lafarge** | $ | **32,466.56** |
| Lafarge-CAD | | 0.00 |
| Commissioner 1 | | 493.77 |
| Commissioner 2 | | 13,716.79 |
| Mavis Road | | 1,469.65 |
| Spy Hill (Calgary) | | -518.85 |
| Wilson | | 22,916.77 |
| **Total Lafarge-CAD** | $ | **38,078.13** |
| Lauren Concrete | | 0.00 |
| Lauren Austin South | | 737.45 |
| **Total Lauren Concrete** | $ | **737.45** |
| Lehigh Hanson-CAD | | 0.00 |
| North Vancouver, Remple Bros. | | -11,825.94 |
| **Total Lehigh Hanson-CAD** | -$ | **11,825.94** |
| Martin Marietta | | 0.00 |
| Corinth | | -6,247.08 |
| Spangler | | -150.00 |
| Tyler North | | 7,355.04 |
| Tyler South | | 14,155.68 |
| **Total Martin Marietta** | $ | **15,113.64** |
| Scott Mothershed | | 11,592.46 |
| Southwest Valley Constructors Co. | | 0.00 |
| Douglas | | -9,900.00 |
| Lukeville A (Conceco) | | -17,700.00 |
| Lukeville B (RMX 100) | | -17,700.00 |
| Naco A1 | | -17,700.00 |
| Naco A2 | | -17,700.00 |
| **Total Southwest Valley Constructors Co.** | -$ | **80,700.00** |
| Superior Materials, LLC | | 0.00 |
| W Jefferson (Plant 32) | | 7,900.20 |
| **Total Superior Materials, LLC** | $ | **7,900.20** |
| TEC-Crete Transit | | 0.00 |
| Ridgewood | | 33,024.00 |
| **Total TEC-Crete Transit** | $ | **33,024.00** |
| Thomas Concrete, Inc. | | 0.00 |
| Atlanta, Buckhead | | 3,261.50 |
| Greer | | -2.00 |
| **Total Thomas Concrete, Inc.** | $ | **3,259.50** |
| US Concrete | | 0.00 |
| Maspeth | | -690.00 |
| **Total US Concrete** | -$ | **690.00** |
| VCNA Prairie LLC | | 0.00 |
| Bridgeview (Yard 1) | | -7,212.00 |
| Des Plaines (Yard 8) | | -14,444.10 |

| | | |
|---|---|---|
| **Total VCNA Prairie LLC** | -$ | 21,656.10 |
| **TOTAL** | $ | 94,931.35 |

As of: Tuesday, Dec 28, 2021 03:30:40 PM GMT-8

**Schedule 2.1(h)**
**Other General Intangibles**

Customer lists and relationships
Drawings, plans and designs relating to NAT Units and system
Non-competes and restrictive covenants with former owners
Trade names
General know how

See Schedule 2.1(e)

**Schedule 2.3**
**Other Liabilities and Obligations**

To be provided.

**Schedule 3.5(a)**
**Cure Amounts**

Schedule 3.5(a) of Cure Amounts is forthcoming.

**Schedule 3.6**
**Legal Proceedings**

To be provided.

**Schedule 3.8(b)**
**Environmental Permits**

None.

**Schedule 3.9(a)**
**Taxes**

Taxes that may be owing
GST/HST taxes for activity in Canada
Property taxes relating to tanks and units
Colorado Department of Revenue taxes (to be paid out of proceeds)